Carmen **VELAZQUEZ, Wep Workers Together!, Community Service Society of New York, Inc., New York City Coalition to End Lead Poisoning, Centro Independiente de Trabajadores Agricolas, Inc., and Greater New York Labor–Religion Coalition, on behalf of all similarly situated individuals, organizations and their members; namely, individuals and organizations**

who are, or wish to be, represented by lawyers employed by entities receiving funds from the Legal Services Corporation, and who wish to assert legal claims as members of a class, or to benefit from some other legal advocacy activity proscribed by Pub.L. 104–208;

Farmworkers Legal Services of New York, Inc., on behalf of itself, and on behalf of all similarly situated not-for-profit legal services entities; namely, organizations who wish to be eligible to receive funds from the Legal Services Corporation, and who wish to be free to engage in legal advocacy activities that are proscribed by Pub.L. 104–208;

Lucy A. Billings, Peggy Earisman, Olive Karen Stamm, Jeanette Zelhof, Elisabeth Benjamin, Jill Ann Boskey, and Lauren Shapiro, on behalf of each, and on behalf of all similarly situated individuals; namely, attorneys employed or formerly employed by entities receiving funds from the Legal Services Corporation who wish to be free to represent indigent individuals in class actions, and to engage in other attorney-client activities that are proscribed by Pub.L. 104–208;

and

Andrew J. Connick, Councilmember C. Virginia Fields, Councilmember Guillermo Linares, Councilmember Stanley Michels, Councilmember Adam Clayton Powell, IV, Senator Lawrence Seabrook, and Assemblyman Scott M. Stringer, on behalf of themselves and all similarly situated individuals; namely, individuals who have provided public or private non-federal funding to entities that also receive funds from the Legal Services Corporation, and who wish these funds to be used for legal advocacy activities that are proscribed by Pub.L. 104–208, Plaintiffs,

v.

LEGAL SERVICES CORPORATION, Defendant.

David F. Dobbins, New York Foundation, Lisa E. Cleary, David W. Ichel, David G. Keyko, MFY Legal Services, Inc., Brooklyn Legal Service Corp. B, Legal Services for New York City, Bronx Legal Services, Inc, on their own behalf and on behalf of their clients, Plaintiffs,

v.

Legal Services Corporation, Defendant.

Nos. 97–CV–182, 01–CV–8371.

United States District Court, E.D. New York.

Dec. 20, 2004.

The Brennan Center for Justice, by Burt Neuborne, Esq., David S. Udell, Esq., Laura Abel, Esq., Craig Siegel, Esq., Kaye, Scholer, Fierman, Hays & Handler, LLP, by Peter M. Fishbein, Esq., Michael F. Bahler, Esq., New York, NY, for Plaintiffs.

Kronish, Lieb, Weiner & Hellman LLP, by Stephen L. Ascher, Esq., Alan Levine, Esq., Rachel Gordon Licten, Esq., Anne Nacinovich, Esq., New York, NY, for Defendant Legal Services Corporation.

United States Department of Justice, Civil Division, by Joseph W. Lobue, Esq., John Tyler, Esq., Washington, DC, for Intervenor–Defendant United States of America.

## MEMORANDUM & ORDER

BLOCK, District Judge.

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .571

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .572
 A. Present Procedural Framework . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .572
 1. Velazquez . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .572
 2. Dobbins . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .574
 B. The As–Applied Challenges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .574

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .580
 A. The Tenth Amendment Challenge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .580

 1. Standing .............................................. 581
 2. Merits ............................................... 583
 B. The Facial Challenges .................................. 585
 1. Conceptual Analysis ................................. 585
 a. The District Court's Decision (Velazquez I) ......... 585
 b. The Circuit Court's Decision (Velazquez II) ......... 586
 c. The Supreme Court's Decision (Velazquez III) ....... 589
 d. The Supreme Court's Decision in American Library Ass'n. .......... 592
 2. Class–Action Restriction........................... 595
 3. Attorney's–Fees Restriction ........................ 596
 4. Solicitation Restriction ............................ 596
 C. The As–Applied Challenges ............................. 598
 1. Standing ........................................... 598
 2. The Undue Burden Test............................. 598
 3. The Nature of the Right............................. 603
 4. The Burdens ....................................... 604
 a. LSNY......................................... 605
 b. SBLS ......................................... 606
 c. FWLS ........................................ 606
 5. The Government's Asserted Interests ............... 607
 a. Preventing the Appearance of Endorsement of Restricted
 Activities ..................................... 607
 b. Preventing Indirect Subsidization of Restricted Activities ............ 609
 6. The Balancing...................................... 610
 a. Equipment .................................... 612
 b. Physical Premises ............................. 612
 c. Employee Time ............................... 612
 d. Intake ....................................... 612

CONCLUSION ................................................. 613

## INTRODUCTION

General familiarity with the prior litigation in Action I (the *Velazquez* action) is presumed, as encompassed by this Court's decision in *Velazquez v. Legal Services Corp.*, 985 F.Supp. 323 (E.D.N.Y.1997) ("*Velazquez I* "), the Second Circuit's decision in *Velazquez v. Legal Services Corp.*, 164 F.3d 757 (2d Cir.1999) ("*Velazquez II* "), and the Supreme Court's decision in *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001) ("*Velazquez III* "). Action II (the *Dobbins* action) was filed after the Supreme Court rendered its decision in *Velazquez III*. Before the Court are the following preliminary injunction applications: (1) all the plaintiffs in both actions bring a facial Tenth Amendment challenge to the extension of the restrictions Congress has imposed on legal-services entities that accept funding from defendant Legal Services Corporation ("LSC") to state and local-government funding of these entities; (2) all the plaintiffs in both actions bring facial First Amendment challenges to three such restrictions: the class-action, attorney's-fees and solicitation prohibitions; (3) two of the *Dobbins* plaintiffs, South Brooklyn Legal Services ("SBLS") and Legal Services of New York ("LSNY"), and one of the *Velazquez* plaintiffs, Farmworker Legal Services ("FWLS") (collectively "plaintiff-grantees"), bring as-applied First Amendment challenges to LSC's program integrity rules. LSC and the United States intervener (the "Government") (collectively "defendants") seek dismissal of both actions pursuant to Fed. R. Civ. Pro. 12(b)(1) and 12(b)(6).

The Court rejects all facial challenges, but grants plaintiff-grantees preliminary injunctive relief in respect to their as-

applied challenges.[1]

## BACKGROUND

### A. Present Procedural Framework

#### 1. *Velazquez*

The *Velazquez* complaint, as amended, mounted a broad-scaled attack under the First, Fifth and Tenth Amendments to proscribed activities imposed on recipients of LSC funds under the Omnibus Consolidated Rescissions and Appropriations Act of 1996 § 504, 110 Stat. 1321–53 (the "Act"),[2] and a regulation enacted by LSC authorizing recipients of LSC funds to create affiliates with non-LSC funds to perform restricted activities, provided there be compliance with LSC's program integrity rules.[3] In addition to FWLS, a former recipient of

1. The complexity of this latest chapter of this litigation and the importance of the issues before the Court are reflected by the substantial amount of material presented to the Court, which includes the parties' six memoranda, volumes of supporting declarations, affidavits and other documentation, an amicus brief, three oral arguments, and seventeen letter briefs.

2. As best the Court can glean, the following are the challenged restrictions:

> None of the funds appropriated in this Act to the Legal Services Corporation may be used to provide financial assistance to any [recipient]:
> (2) that attempts to influence the issuance, amendment, or revocation of any executive order, regulation, or other statement of general applicability and future effect by any Federal, State, or local agency [the "executive-order restriction"];
> (3) that attempts to influence any part of any adjudicatory proceeding of any Federal, State, or local agency if such part of the proceeding is designed for the formulation or modification of any agency policy of general applicability and future effect [the "agency-adjudication restriction"];
> (4) that attempts to influence the passage or defeat of any legislation, constitutional amendment, referendum, initiative, or any similar procedure of the Congress or a State or local legislative body [the "legislation restriction"] [collectively, subsections (2), (3) and (4) are referred to as the "lobbying restrictions"];
> (7) that initiates or participates in a class action suit [the "class-action restriction"];
> (11) that provides legal assistance for or on behalf of [certain] alien[s];
> (13) that claims (or whose employee claims), or collects and retains, attorneys' fees pursuant to any Federal or State law permitting or requiring the awarding of such fees [the "attorney's-fees" restriction];
> (15) that participates in any litigation on behalf of a person incarcerated in a Federal, State, or local prison;
> (16) that initiates legal representation or participates in any other way, in litigation, lobbying, or rulemaking, involving an effort to reform a Federal or State welfare system, except that this paragraph shall not be construed to preclude a recipient from representing an individual eligible client who is seeking specific relief from a welfare agency if such relief does not involve an effort to amend or otherwise challenge existing law in effect on the date of the initiation of the representation [the "welfare-reform restriction"];
> (18) unless such person or entity agrees that the person or entity, and the employees of the person or entity, will not accept employment resulting from in-person unsolicited advice to a nonattorney that such nonattorney should obtain counsel or take legal action, and will not refer such nonattorney to another person or entity or an employee of the person or entity, that is receiving financial assistance provided by the Corporation [the "solicitation restriction"]

Act § 504(a). *See also Velazquez I,* 985 F.Supp. at 328 n. 7 (setting forth provisions challenged).

3. 45 C.F.R. § 1610.3 provides "[a] recipient may not use non-LSC funds for any purpose prohibited by the LSC Act or for any activity prohibited by or inconsistent with [the Act], unless such use is authorized by [these regulations]." The program integrity rules are set forth in 45 C.F.R. § 1610.8 and provide:

> (a) A recipient must have objective integrity and independence from any organization that engages in restricted activities. A recipient will be found to have objective in-

LSC funds, which refused to accept such funds after the Act's restrictions went into effect, the other *Velazquez* plaintiffs are clients of LSC grantees, lawyers employed by LSC grantees, and public-office holders of state and local governmental entities, which entities have given non-federal monies to LSC grantees ("government-donor plaintiffs"). In *Velazquez I*, the Court tersely disposed of plaintiffs' Fifth Amendment challenge, finding no due process or equal protection violations, and rejected their First Amendment facial challenge to the program integrity rules, holding that they were lawfully adopted by LSC and facially afforded a means by which LSC-fund recipients could create affiliates with non-LSC funds to engage in activities prohibited by the Act. Plaintiffs appealed the rejection of their First Amendment challenge, and the Court of Appeals affirmed. In doing so, it also passed upon plaintiffs' facial challenges to some of the restricted activities. Other than their challenge to the "suits-for-benefits" exception of the welfare-reform restriction, the circuit court rejected all such facial challenges, finding the

restrictions to be viewpoint neutral. In respect to the "suits-for-benefits" exception, the circuit court held that it violated the First Amendment because it "unconstitutionally restricts freedom of speech, insofar as it restricts a grantee, seeking relief for a welfare applicant, from challenging existing law." *Velazquez II*, 164 F.3d at 772. On that issue, the Supreme Court granted LSC's application for *certiorari, see Legal Services Corp. v. Velazquez*, 529 U.S. 1052, 120 S.Ct. 1553, 146 L.Ed.2d 459 (2000), but affirmed. *See Velazquez III*, 531 U.S. at 549, 121 S.Ct. 1043.[4]

Having been denied a preliminary injunction based on their *facial* constitutional challenges under the First and Fifth Amendments (other than their successful First Amendment challenge to the "suits-for-benefits" exception), plaintiffs now seek a second preliminary injunction. They press at this time their facial Tenth Amendment challenge, claiming that subjecting the use of funds from state and local governments to the same restrictions applicable to LSC funds impermissibly intrudes upon state and local-government autonomy. In respect to their facial chal-

---

tegrity and independence from such an organization if:

(1) The other organization is a legally separate entity;

(2) The other organization receives no transfer of LSC funds, and LSC funds do not subsidize restricted activities; and

(3) The recipient is physically and financially separate from the other organization. Mere bookkeeping separation of LSC funds from other funds is not sufficient. Whether sufficient physical and financial separation exists will be determined on a case-by-case basis and will be based on the totality of the facts. The presence or absence of any one or more factors will not be determinative. Factors relevant to this determination shall include but will not be limited to:

(i) The existence of separate personnel;

(ii) The existence of separate accounting and timekeeping records;

(iii) The degree of separation from facilities in which restricted activities occur, and the extent of such restricted activities; and

(iv) The extent to which signs and other forms of identification which distinguish the recipient from the organization are present.

(b) Each recipient's governing body must certify to the Corporation within 180 days of the effective date of this part that the recipient is in compliance with the requirements of this section. Thereafter, the recipient's governing body must certify such compliance to the Corporation on an annual basis.

4. The Supreme Court denied plaintiffs' application for *certiorari. See Velazquez v. Legal Services Corp.*, 532 U.S. 903, 121 S.Ct. 1224, 149 L.Ed.2d 135 (2001).

lenges to the class-action, attorney's-fees and solicitation restrictions, they contend that the solicitation challenge had been part of their prior preliminary injunction application, but was not addressed by either the district court or circuit court in *Velazquez I* and *II*, and that even if the circuit court's decision in *Velazquez II* be construed as passing upon and rejecting the facial challenges to the class-action and attorney's-fees restrictions, each of these three facial challenges must now be reevaluated as a consequence of the Supreme Court's decision in *Velazquez III*. Furthermore, FWLS raises for the first time an *as-applied* First Amendment challenge to LSC's application of its program integrity rules, asserting that they impose an unconstitutional undue burden on its ability to create a non-LSC funded affiliate to engage in the Act's restricted activities.

## 2. *Dobbins*

In the *Dobbins* action, all the plaintiffs—LSC grantees, former LSC grantees, and private donors—none of whom are plaintiffs in *Velazquez*, join *Velazquez* plaintiffs' preliminary injunction applications as to their facial Tenth Amendment challenge and facial First Amendment challenges to the class-action, attorney's-fees and solicitation restrictions. In addition, two of the plaintiff-grantees, SBLS and LSNY, join *Velazquez* plaintiff FWLS in mounting as-applied First Amendment challenges to LSC's application of its program integrity rules.

## B. The As–Applied Challenges

The as-applied challenges to LSC's application of its program integrity rules flow from the recognition by the circuit court in *Velazquez II* that, although "Congress may burden the First Amendment rights of recipients of government benefits if the recipients are left with adequate alterna-

tive channels for protected expression[,]" 164 F.3d at 766,

> [i]t may be, as plaintiffs urge, that the program integrity rules will, in the case of some recipients, prove unduly burdensome and inadequately justified, with the result that the 1996 Act and the regulations will suppress impermissibly the speech of certain funded organizations and their lawyers. And it may be, as plaintiffs contend, that the program integrity requirements may prove especially burdensome in the context of legal services. We are unable to assess these contentions on the sparse record before us, and we need not assess them to decide this appeal. Any grantee capable of demonstrating that the 1996 restrictions in fact unduly burden its capacity to engage in protected First Amendment activity remains free to bring an as-applied challenge to the 1996 Act. But plaintiffs present little evidence to support their predictions regarding how seriously the 1996 Act will affect grantees generally, and they provide no basis for concluding that the program integrity rules cannot be applied in at least some cases without unduly interfering with grantees' First Amendment freedoms.

*Id.* at 767.

On April 25, 2003, SBLS, LSNY and FWLS submitted an affiliation proposal to the Court, a structure these plaintiff-grantees contended would not impose an undue burden on their First Amendment rights. LSC rejected the proposal because, *inter alia*, it believed it was merely "a generalized outline of a set of hypothetical affiliations." Letter from Stephen L. Ascher on behalf of LSC (May 9, 2003) at 1. In response, on May 22, 2003, the plaintiff-grantees submitted a "Clarification of

Configuration Proposal" ("Clarified Proposal"),[5] which provided more detail:

1. **Legal separation**—Each of the grantee-plaintiffs (also referred to as "LSC grantee affiliates") proposes to establish a legally separate corporation (the "non-LSC grantee affiliate") with its own articles of incorporation and bylaws, in accordance with the laws of New York State.

2. **Easily distinguishable names**— The LSC grantee affiliates propose, at this time, to use the following names for each respective non-LSC grantee affiliate:

| LSC grantee affiliate | Non-LSC grantee affiliate |
| --- | --- |
| Legal Services for New York City | New York City Justice Center |
| South Brooklyn Legal Services | South Brooklyn Justice Center |
| Farmworker Legal Services of [NY] | Farmworker Justice Center |

3. **Separate boards of directors**— The boards of directors of the LSC grantee affiliates and of the non-LSC grantee affiliates, will be separate: a) the boards of the respective LSC and non-LSC affiliates will meet separately and maintain separate records; and b) the membership of the boards of directors of the LSC and non-LSC affiliates will be coextensive at the outset, but this may change over time depending on various factors. Moreover, plaintiff-grantee LSNY would prefer to operate through an affiliate structure in which LSNY would possess authority to determine the composition of the board of the New York City Justice Center.

4. **No subsidy**—No LSC grantee affiliate will transfer any LSC funds to a non-LSC grantee affiliate. Affiliated organizations will apportion fair value for expenses in accordance with generally accepted accounting principles and the requirements of the LSC Accounting Guide for LSC recipients, the LSC Office of Inspector General Audit Guide for Recipients and Auditors, and LSC regulation 45 C.F.R. § 1630, Cost Standards and Procedures, which provides "uniform standards for allowability of costs" charged to LSC grants, including both direct costs (e.g., salaries) and indirect costs (e.g., utilities and other forms of overhead costs). In particular, affiliated organizations will allocate indirect costs pursuant to 45 C.F.R. § 1630.3(f), which governs the allocation of indirect costs by LSC grantees, and by separately identifying the total costs for restricted activities and treating these costs as disallowed costs pursuant to 45 C.F.R. § 1630.2(d).

5. **Employee timekeeping measures**—Any employee in the category of "legal personnel" who is employed part-time by an LSC grantee affiliate and by a non-LSC grantee affiliate, will maintain detailed time records for the work performed for each affiliate. These records will comply with LSC's timekeeping regulation, 45 C.F.R. § 1635, including the requirement that an LSC grantee:

shall require any attorney or paralegal who works part-time for the recipient and part-time for an organization that engages in restricted activities to certify in writing that the attorney or

---

5. The Clarified Proposal is attached to the Letter from Stephen L. Ascher on behalf of LSC (June 24, 2003). With the exception of internal citations and footnotes, the Court includes the Clarified Proposal in its entirety.

paralegal has not engaged in restricted activity during any time for which the attorney or paralegal was compensated by the recipient or has not used recipient resources for restricted activities. The certification requirement does not apply to a *de minimis* action related to a restricted activity.

45 C.F.R. § 1635.3(d).

Additionally, any employee in the category of "non-legal personnel" (i.e., support personnel) who is employed part-time by an LSC grantee affiliate and by a non-LSC grantee affiliate, will maintain personnel activity reports, pursuant to LSC regulation 45 C.F.R. § 1630.3(d), for work performed for each affiliate. The regulation, which provides standards governing allowability of costs under LSC grants or contracts, incorporates the detailed guidance about personnel activity reports contained in Office of Management and Budget ("OMB") Circular A–122, Cost Principles for Non–Profit Organizations, Attachment B, para. 6($l$)(2) (Aug. 29, 1997)....

No legal personnel, and no non-legal personnel, will engage in any LSC-funded activities while working as an employee of a non-LSC grantee affiliate.

6. **Signage and Disclaimers**—A "disclaimer" will be provided in writing individually to all clients, prospective clients, opposing attorneys and other visitors entering the premises of the LSC grantee affiliate and of the non-LSC grantee affiliate. The disclaimer will also be provided in writing individually to all clients and prospective clients who otherwise meet in-person with an employee of an affiliate. The written disclaimer will be printed on an 8.5 × 11 inch sheet of paper in 12 point type. It will also be publish-ed on web sites maintained by the affiliates, and in the places and manners described in the grantee-plaintiffs' April 25, 2003 proposal.

An oral disclaimer will be made in-person, and in telephone communications, to all individual clients and prospective clients. In addition to the written disclaimers to courts and government officials provided in paragraph six of the grantee-plaintiffs' April 25, 2003 proposal, disclaimers will also be made orally to all individual judges, opposing attorneys, government officials, journalists and others who come into contact with either affiliate.

For example, South Brooklyn Legal Services and the affiliated South Brooklyn Justice Center will present the following written and oral disclaimer (or a disclaimer containing similar text to the same effect) to all clients, prospective clients, and others identified above in paragraph six:

South Brooklyn Legal Services ("SBLS") and the South Brooklyn Justice Center (the "Justice Center") are separate, independent non-profit corporations. SBLS receives funds from the Legal Services Corporation ("LSC") to provide certain approved categories of legal assistance. Use of these funds from LSC is restricted by federal law. The Justice Center does not receive any LSC funds. Congress has refused to allow LSC funds to be used to finance the work of the Justice Center. Nevertheless, SBLS and the Justice Center cooperate to serve the legal needs of the low-income individuals and families in South Brooklyn.

In addition, the non-LSC grantee will include the following disclaimer (or similar text to the same effect) in all client retainer agreements:

I have read and understood the following: The South Brooklyn Justice Center (the "Justice Center") is representing me. The Justice Center does not receive any Legal Services Corporation ("LSC") funds. Congress has refused to allow LSC funds to be used to finance the work of the Justice Center.

In addition, the LSC grantee will include the following disclaimer (or similar text to the same effect) in all client retainer agreements:

I have read and understood the following: The South Brooklyn Legal Services ("SBLS") is representing me. SBLS receives funds from the Legal Services Corporation ("LSC") to provide certain approved categories of legal assistance. Federal law restricts the use of these LSC funds and all other funds provided to SBLS.

Affiliates will produce the disclaimers in both English and Spanish, and will, pursuant to existing office policies, provide additional translation into other languages.

7. **Equipment**—The respective affiliates propose to share equipment and physical resources, including, telephone lines, computers, case management systems, libraries, legal research facilities, office furnishings, printers, fax machines and web sites.

8. **Physical premises**—The respective affiliates propose to operate in one physical location with no physical separation beyond that degree of physical separation required of other non-profit federal grantees by Presidential Executive Order No. 13279, 67 Fed.Reg. 77141 (Dec. 12, 2002), entitled Equal Protection of the Laws for Faith-based and Community Organizations.

[Those] standards … applied in the context of the legal services programs, would permit the LSC and non-LSC affiliates to operate in a single physical location, but would require the non-LSC grantee affiliate to provide LSC-restricted services "separately in time or location from any programs or services supported" with LSC funds.

More specifically, these standards would require, for example, that a non-LSC grantee affiliate conduct its LSC-restricted activities either in a room separate from any room in which its LSC grantee affiliate is simultaneously conducting LSC-approved activities, or in the same room but at separate times.

9. **Employee time**—The LSC and non-LSC affiliates propose to share all legal, support and supervisory personnel (including an Executive Director, who will direct both programs). No personnel will engage in LSC-funded activities while working in the capacity as an employee of a non-LSC grantee affiliate.

10. **Intake**—The respective affiliates propose to share a common intake and allocation mechanism to refer clients and cases between the affiliates. [As noted], an individual disclaimer will be provided to each individual client or prospective client who contacts either affiliate.

LSC also rejected this proposal. *See* Office of Legal Affairs External Opinion # EX–2003–1009 ("OLA External Opinion"), attached to Letter from Stephen L. Ascher on behalf of LSC (June 24, 2003). It concluded that the proposal satisfied the first two program integrity rules (legally separate entities and no subsidization); however, it failed to meet the third (physical and financial separation) because "the

proposed 100% sharing of physical space, equipment, and staffs, demonstrate that the proposal as a whole fails to provide physical and financial separation." *Id.* at 8. It viewed physical and financial separation as "the most nuanced and complex of the three factors required by the [program integrity rules,]" *id.* at 3, explaining:

> Whether physical and financial separation exists is determined on a case-by-case basis, considering the totality of the circumstances. Individual factors present in one situation might be acceptable in the context of the overall relationship between the entities, although they might be unacceptable in another situation in which other factors weigh more heavily against a finding of sufficient separation. Each factor weighs for or against separation. Some factors are heavy, some are light. It is the total weight of all the factors together that LSC looks at in determining the strength of the grantee's physical and financial separation from the other entity. However, in all situations the separation between the organizations must be clear to clients, courts, agencies and others with whom the recipient comes into contact, and to the general public.
>
> It is also important to note that the financial separation requirement is distinct from the non-subsidization requirement. While bookkeeping can provide evidence of a lack of subsidization, the regulation explicitly states that mere bookkeeping separation is insufficient to meet the physical and financial separation requirement.

*Id.*

LSC explained why, in its view, the Clarified Proposal's sharing of equipment, premises, personnel and intake demonstrated a lack of physical and financial separation:

**Equipment:** In respect to the sharing of equipment, LSC believed that it "clearly indicates a lack of physical and financial separation" since "each grantee would essentially share one infrastructure with a non-LSC affiliate." *Id.* at 6. It acknowledged that its rules "allow[ ] for organizations to share some equipment, such as a copier and a library," but "a complete sharing of *all* office property, including telephones, furniture, case management systems, etc., would be a heavy indicia of a lack of physical separation." *Id.* at 6–7 (emphasis in original). It recognized, however, that the sharing of costs had no bearing on the issue of subsidization. *See id.* at 7 ("Although the proposal notes that the costs of the equipment is intended to be apportioned, that aspect speaks only to subsidization, but not to physical and financial separation.").

**Physical Premises:** LSC also viewed this aspect of the Clarified Proposal "[a]s with the situation of equipment, ... as having essentially one infrastructure[,]" *id.*, once again drawing a distinction between subsidization and physical and financial separation. *See id.* ("The fact that the costs of the space would be shared speaks only to subsidization but not to physical and financial separation (mere bookkeeping separation *is not enough*). Allowing for the two entities to operate entirely out of one physical location without any physical separation between their respective offices would directly violate the ... requirement that they have physical and financial separation.").

**Employee Time:** LSC recognized that "[t]here is no *per se* bar against a recipient employing part-time staff who are also employed part-time by an organization which engages in restricted activity[,]" but that "[a]lthough it may be consistent [with the regulations] for affiliate organizations to share *some* personnel, a 100% overlapping

staff weighs heavily against true physical and financial separation." *Id.* (emphasis in original). It did not view the plaintiff-grantees' pledge that "no personnel will engage in LSC funded activities while working in the capacity as an employee of a non-LSC grantee affiliate" as "ameliorat[ing] the problem that by having completely overlapping staffs, each grantee and its affiliate appear to be essentially one organization[,]" once again recognizing that the issue was one of physical and financial separation, rather than subsidization. *See id.* at 8 ("In the same way that apportioning costs for overhead and equipment speaks only to the issue of subsidization and not to physical and financial separation, the fact that employees 'on the clock' for the grantee would not be doing any work for the affiliate, and vice versa, serves only to prevent potential subsidizations and is not sufficient to demonstrate physical and financial separation of the organizations.").

**Intake:** LSC did not rail against sharing a common intake and allocation mechanism; rather, its concern with the Clarified Proposal in that respect was that "[t]he only description of how the intake system will work is a statement that the disclaimers described in the proposal will be provided to applicants for service and clients." *Id.* LSC believed that "[a]s the point of entry for clients, a shared intake mechanism must clearly differentiate between the two entities[,]" and that the plaintiff-grantees' disclaimer proposal "[b]y itself ... does very little to give the clients a clear experience of being directed to one of two separate organizations rather than merely being routed within one entity." *Id.*

Notably, LSC acknowledged that even if the two organizations were to share all physical premises, staff and equipment, adequate signage and disclaimers might satisfy any concerns that the public might *perceive* that the organizations were not physically and financially separate. *See id.* at 6 ("As described the signage and disclaimers would appear to indicate physical and financial separation. However, to the extent that the organizations plan to share all physical premises, equipment and staff, they would need extensive signage and other indicia of separateness to address the obvious perception that the respective organizations are not, in any but a superficial way, physically and financially separate.").

At oral argument on June 16, 2004, the Court expressed concern that the parties' extensive affidavits regarding the as-applied preliminary injunction application did not clearly present uncontested facts, and afforded them an opportunity to stipulate to the facts that they believed were relevant or, if necessary, to identify contested facts for resolution at a factual hearing. *See* June 16, 2004 Tr. at 4–7.[6] Thereafter, the parties entered into a stipulation and advised the Court that there was no need for a hearing. *See* Letter from Anne Nacinovich on behalf of LSC (July 6, 2004) at 1 & Attach. Parties' Stipulated Facts ("Stipulation"). In the main, plaintiff-grantees identified in the Stipulation the financial burdens that LSC's rejection of their Clarified Proposal imposed upon their ability to create unrestricted alternative channels with non-federal funds. For its part, LSC identified a number of approved affiliation proposals where there was some sharing of personnel, including part-time attorneys. *See* Stipulation ¶ 12. LSC states that "sharing a substantial number or proportion of recipient staff calls the recipient's separateness into question.... For larger organizations,

---

6. "June 16, 2004 Tr." refers to the transcript of the oral argument held on June 16, 2004.

10% of the recipient's attorney/paralegal staff should serve as a guide. However, for recipients with smaller staffs, the program director should use his or her best judgment to determine whether part-time staff constitutes a substantial proportion of the recipient's legal work-force." Stipulation ¶ 5 (citation omitted).

The Court held further oral argument on November 15, 2004 to seek, *inter alia,* clarification of what it perceived to be an inconsistency as to the degree of physical separation contemplated by the Clarified Proposal and LSC's reason for rejecting that aspect of the proposal: LSC viewed the Clarified Proposal as not providing for "any physical or financial separation whatsoever[,]" Letter from Stephen L. Ascher on behalf of LSC (June 24, 2003) at 1, even though the plaintiff-grantees, incorporating the degree of physical separation required of other non-profit federal grantees under the President's Faith–Based Initiative Program, proposed that a non-LSC grantee affiliate would conduct its LSC-restricted activities "either in a room separate from any room in which its LSC grantee affiliate is simultaneously conducting LSC-approved activities, or in the same room but at separate times." Clarified Proposal at 5.

When this was pointed out to LSC's counsel, he agreed that "it may be possible for ... grantee affiliate[s] to enter into a situation where they have separate offices within the same building or within the same floor, as long as there is adequate signage," and that "[i]t is possible, based on the totality of the circumstances," that even adjoining rooms "would not violate the program integrity regulation." Nov. 15, 2004 Tr. at 11–12.[7] The Government's attorney went one step further, stating: "I

make no distinction between next door or the floor below or the floor above. If it's a separate set of offices, that's all that's required by the regulation." *Id.* at 28–29. The LSC attorney, however, drew a line when questioned about allowing non-restricted affiliate activities to be conducted at different times in the same room as LSC-restricted activities because it "would create too much risk of confusion." *Id.* at 12.

The Government's counsel raised at this oral argument his concern that the same lawyer might be handling both LSC and non-LSC components of the same case, which he believed would be contrary to Congress' purpose "to focus the LSC-funded attorneys' efforts on cases that the private sector would not handle." *Id.* at 29. Plaintiff-grantees' counsel offered to assuage this concern by stating that "if there is a significant non-LSC component in the case, it has to be handled by a non-LSC lawyer." *Id.*

## DISCUSSION

### A. The Tenth Amendment Challenge

Plaintiffs argue that the Act and program integrity rules violate the Tenth Amendment because they "interfere with the ability of state and local governments to provide funds to LSC grantees in an effort to improve the efficiency and fairness of important state and local institutions." Mem. Supp. Pls.' Mot. Prelim. Inj. ("Pls.' Mem.") at 47. Specifically, they contend that "state and local efforts to aid LSC grantees must either become encumbered by [LSC's] restrictions, or be expended on wasteful attempts to establish and maintain burdensome separate enti-

---

7. "Nov. 15, 2004 Tr." refers to the transcript of the oral argument held on November 15, 2004.

ties."[8] *Id.* at 48. In addition to opposing this constitutional challenge on the merits, defendants contend that none of the plaintiffs have standing.

## 1. Standing

 Standing is a jurisdictional prerequisite that imposes both constitutional and prudential constraints on a litigant's right to access the courts for the resolution of judicial disputes. As the Second Circuit has explained:

> Whether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy is what has traditionally been referred to as the question of standing to sue. Article III, § 2 of the United States Constitution restricts federal courts to deciding Cases and Controversies. From this has emerged the doctrine of constitutional standing. Federal courts must determine standing at the threshold of every case. It would violate principles of separation of powers for [the Court] to hear a matter that was not a case or controversy and therefore not delegated to the federal judiciary under Article III.

> At an irreducible constitutional minimum, Article III standing requires that the plaintiff have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical.

*State of Connecticut v. Physicians Health Servs. of Connecticut, Inc.*, 287 F.3d 110, 116–17 (2d Cir.2002) (internal citations, quotations and alterations omitted). "Article III standing also requires that there be a causal connection between the injury and the conduct complained of and that it is likely that the injury will be redressed by a favorable decision." *Id.* at 117 n. 7 (internal citations, quotations and alteration omitted); *see Jenkins v. United States*, 386 F.3d 415, 417 (2d Cir.2004) ("To establish Article III standing, a plaintiff must therefore allege, and ultimately prove, that he has suffered an injury-in-fact that is fairly traceable to the challenged action of the defendant, and which is likely to be redressed by the requested relief." (internal citations and emphasis omitted)). Last, "as a prudential principle, ... plaintiff[s] generally must assert [their] own legal rights and interests, and cannot rest [their] claim to relief on the legal rights or interests of third parties." *Physicians Health Servs., Inc.*, 287 F.3d at 117 (internal citations, quotations and alteration omitted).

In *Tennessee Electric Power Co. v. Tennessee Valley Authority*, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939), the Supreme Court "observed in passing that 'absent the states or their officers,' private parties 'have no standing ... to raise any question under the [Tenth] [A]mendment.'" *Gillespie v. City of Indianapolis*, 185 F.3d 693, 700 (7th Cir.1999) (quoting *Tenn. Elec. Power Co.*, 306 U.S. at 144, 59 S.Ct. 366). Defendants have referenced two district courts that have construed this "passing" reference as binding precedent, requiring them to reject standing. *See Medeiros v. Atlantic States Marine Fisheries Comm'n*, 327 F.Supp.2d 145, 153–54 (D.R.I.2004); *Vermont Assembly of Home Health Agencies, Inc. v. Shalala*, 18 F.Supp.2d 355, 371 (D.Vt.1998).

In the Court's view, the passing comment in *Tenn. Elec. Power Co.* is best viewed as *dicta* since the high court

---

**8.** The Tenth Amendment provides that the "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

reached the merits. *See* Ara B. Gershengorn, *Private Party Standing to Raise Tenth Amendment Commandeering Challenges*, 100 Colum. L.Rev. 1065, 1073 (2000) (noting that in *Tenn. Elec. Power Co.*, the Supreme Court rejected the claim on the merits, "but added in *dicta*, language that intimated that only the state could raise a Tenth Amendment commandeering claim."). As such, "a distinction should be drawn between 'obiter dictum,' which constitutes an aside or an unnecessary extension of comments, and considered or 'judicial dictum' where the Court . . . is providing a construction of a statute to guide the future conduct of inferior courts." *United States v. Bell*, 524 F.2d 202, 206 (2d Cir.1975). The passing comment by the Supreme Court in *Tenn. Elec. Power Co.* is of the "obiter dictum" variety. Even if it were "judicial dictum," it would still "not be binding," although "it must be given considerable weight and can not be ignored in the resolution of [a] close question. . . ." *Id.*

In *Gillespie*, the Seventh Circuit bypassed the issue of the weight, if any, to be accorded to the Supreme Court's "passing comment," simply noting that "standing barriers have been substantially lowered in the decades since the Supreme Court decided *Tenn[.] Elec. Power Co.*," *Gillespie*, 185 F.3d at 700 (internal citation omitted), and addressed the merits of the Tenth Amendment standing issue. In that regard, the circuit court commented that "a difference of opinion among the lower courts exposes the unsettled nature of the issue." *Id.; see also id.* 700 n. 3 (collating cases). This difference perdures. *Compare Dillard v. Baldwin County Comm'rs*, 225 F.3d 1271, 1276 (11th Cir.2000) (find-

ing standing), *with United States v. Parker*, 362 F.3d 1279, 1285 (10th Cir.2004) (no standing). There is no Second Circuit authority.[9] Noticeably, other than the two district courts that believed they were bound by *Tenn. Elec. Power, Co.*, no other court passing upon the merits of the standing issue has mentioned that case. As reflected by *Dillard* and *Parker*, they have come to different conclusions as to whether a sufficient nexus exists between an individual and the rights protected by the Tenth Amendment to warrant standing.

The *Gillespie* court came down on the standing side, and the Court agrees, viewing *Gillespie* as providing the most reasoned decision. Its conclusion that "the Tenth Amendment, although nominally protecting state sovereignty, ultimately secures the rights of individuals," *Gillespie*, 185 F.3d at 703, was appropriately influenced by the Supreme Court's language in *New York v. United States*, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992): "The Constitution does not protect the sovereignty of the states for the benefit of the States or state governments as abstract political entities, or even for the benefit of the public officials governing the States. To the contrary, the Constitution divides authority between federal and state governments for the protection of individuals." *Gillespie*, 185 F.3d at 703 (quoting *New York*, 505 U.S. at 181, 112 S.Ct. 2408).

■ The residual question, therefore, is whether the plaintiffs meet the constitutional and prudential standing requirements. In respect to the requisite "injury-in-fact," the Second Circuit has instructed that "marginal differences are not mean-

---

9. In *Pierce County, Washington v. Guillen*, 537 U.S. 129, 148 n. 10, 123 S.Ct. 720, 154 L.Ed.2d 610 (2003), the Supreme Court chose not to pass upon the expanded question of "whether private plaintiffs have standing to assert states rights under the Tenth Amendment where their States' legislative and executive branches expressly approve and accept the benefits and terms of the federal statute in question[.]"

ingful in assessing allegations of injury-in-fact since the injury-in-fact necessary for standing need not be large, an identifiable trifle will suffice." *New York Pub. Interest Research Group v. Whitman,* 321 F.3d 316, 326 (2d Cir.2003). With the exception of the government-donor plaintiffs, the plaintiffs have alleged, at the minimum, an "identifiable trifle" of an injury-in-fact because they each are affected in some fashion by the restrictions Congress has imposed upon a grantee's use of state and local funds; there is an obvious "causal connection between the claimed injury and the challenged conduct," and the Court would likely "be able to redress the plaintiff[s'] injuries through the exercise of its remedial powers." *Id.* at 701. Nor are there prudential obstacles to standing since these plaintiffs assert their own interests, and not simply the interests of third parties.

■ This is not the case, however, with the government-donor plaintiffs, who are several members of the New York City Council, a New York State Senator, and a New York State Assemblyman. Members of legislative bodies may sue to remedy injuries they personally suffer. *See, e.g., Powell v. McCormack,* 395 U.S. 486, 512–14, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) (recognizing member of Congress' standing to sue for back pay as result of the House of Representatives' refusal to seat him). Unlike the other plaintiffs, however, the government-donor plaintiffs have not articulated how they have personally suffered any injury. Legislators may also establish standing by alleging an "institutional injury" when their "votes would have been sufficient to defeat (or enact) a specific legislative Act ... if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." *Raines v. Byrd,* 521 U.S. 811, 823, 117 S.Ct. 2312,

138 L.Ed.2d 849 (1997). The government-donor plaintiffs make no such allegation. Nor do they allege that they have been authorized to sue on behalf of their respective legislative bodies. *See id.* at 829, 117 S.Ct. 2312 ("We attach some importance to the fact that appellees have not been authorized to represent their respective Houses of Congress in this action."). Thus, the government-donor plaintiffs have not met their burden of establishing standing. *See Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1092 (2d. Cir.1995) ("The burden to establish standing remains with the party claiming that standing exists.").

## 2. Merits

The Tenth Amendment is meant to protect the system of dual federal-state sovereignty. *See Printz v. United States,* 521 U.S. 898, 918, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) ("[T]he Constitution established a system of dual sovereignty.... Residual state sovereignty was ... rendered express by the Tenth Amendment[ ]...."). Accordingly, as the Second Circuit has explained, "[f]ederal statutes validly enacted under one of Congress's enumerated powers ... cannot violate the Tenth Amendment unless they commandeer the states' executive officials, or legislative processes." *Physicians Health Servs., Inc.,* 287 F.3d at 122 (internal citations omitted).

Congress may, however, provide incentives to influence state action through its spending power without offending the Tenth Amendment. For example, over a half century ago, the Supreme Court, in *Oklahoma v. Civil Service Commission,* 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794 (1947), in passing upon the constitutionality of the Hatch Act in the face of a Tenth Amendment challenge, held that Congress may lawfully withhold federal funding for state employees if the state did not comply

with the Act. Similarly, in *South Dakota v. Dole*, 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987), the Supreme Court rejected a Tenth Amendment challenge to a federal statute that conditioned federal funding for state highways on the state's adoption of a 21–year–old drinking age. In so doing, it explained its holding in *Civil Service Commission* as follows:

> [T]he Court considered the validity of the Hatch Act insofar as it was applied to political activities of state officials whose employment was financed in whole or in part with federal funds. The State contended that an order under this provision to withhold certain federal funds unless a state official was removed invaded its sovereignty in violation of the Tenth Amendment. Though finding that the United States is not concerned with, and has no power to regulate, local political activities as such of state officials, the Court nevertheless held that the Federal Government does have power to fix the terms upon which its money allotments to states shall be disbursed. The Court found no violation of the State's sovereignty because the State could, and did, adopt the simple expedient of not yielding to what she urges is federal coercion. The offer of benefits to a state by the United States dependent upon cooperation by the state with federal plans, assumedly for the general welfare, is not unusual.

483 U.S. at 210, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (internal citations and quotations omitted). *See also Hodel v. Virginia Surface Min. & Reclamation Ass'n*, 452 U.S. 264, 292 n. 33, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) ("[E]ven if it is true that the [federal statute's] requirements will have a measurable impact on Virginia's economy, this kind of effect, standing alone, is insufficient to establish a violation of the Tenth Amendment.").

■ The present case is more compelling than these precedents. The state and local governments are hardly being coerced into yielding their funds. They have full reign as to how they choose to use their monies to fund legal services for indigents, without fear of federal retribution. Thus, they may believe it wise to also limit their funding to non-restricted activities, or they may prefer to provide funding to LSC recipients for the creation of alternative channels, or they may prefer to establish their own mechanisms for rendering legal services to the poor.

The cases principally relied upon by plaintiffs in support of their Tenth Amendment challenge, *Printz v. United States*, 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997), *New York*, and *Gregory v. Ashcroft*, 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991), are inapposite.

In *Gregory*, the Supreme Court simply held that the federal Age Discrimination in Employment Act was not intended to invalidate state mandatory retirement laws for judges; therefore, the balance between federal and state powers at the heart of the Tenth Amendment was preserved since Congress chose not to interfere with the state's operations of its courts. Affording the state the option to decide whether it would be willing to use its monies to fund the restricted activities is the antithesis of federal intrusion upon state governmental operations.

*New York* and *Printz* simply represent two examples of proscribed "commandeering." Thus, in *Printz*, the Supreme Court determined that a federal law requiring state law enforcement officers to conduct background checks on prospective handgun purchasers violated the Tenth Amendment because it commandeered state officers to execute federal laws. 521 U.S. at 933, 117 S.Ct. 2365. And in *New York*, the Supreme Court struck down a federal law

that required states to either accept ownership of radioactive waste or regulate the disposal of such waste according to federal requirements, as violative of the Tenth Amendment because Congress was "commandeer[ing] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." 505 U.S. at 161, 112 S.Ct. 2408 (internal citations and quotations omitted). *New York* actually undercuts plaintiffs' Tenth Amendment challenge by noting that Congress does not "lack[ ] the ability to encourage a State to regulate in a particular way, or that Congress may ... hold out incentives to the States as a method of influencing a State's policy choices." *Id.* at 166, 112 S.Ct. 2408.

**B. The Facial Challenges** [10]

**1. Conceptual Analysis**

The facial challenges to the class-action, attorney's-fees and solicitation restrictions require focused analyses of the decisions of the Second Circuit in *Velazquez II* and the

Supreme Court in *Velazquez III*, as well as the Supreme Court's decision subsequent to *Velazquez III* in *United States v. American Library Ass'n*, 539 U.S. 194, 123 S.Ct. 2297, 156 L.Ed.2d 221 (2003), addressing its holding in *Velazquez III*.

**a. The District Court's Decision (*Velazquez I*)**

Initially, it is useful to begin by revisiting the precise issues raised and adjudicated by this Court in *Velazquez I*. The Court first noted that the final program integrity rules were designed to salvage the constitutionality of the Act's restrictions by affording the plaintiffs the opportunity to establish affiliate organizations, and culled from the parties' numerous submissions that, in addition to the due process and equal protection challenges,

the following issues [were] fairly presented to the Court in the context of plaintiffs' preliminary injunction application: (1) can the LSC lawfully adopt regulations to guard against the appear-

---

**10.** Plaintiffs contend that their "challenges to the solicitation, attorney's fees and, class action restrictions are both as-applied and facial." Letter from Burt Neuborne on behalf of plaintiffs (Nov. 12, 2004) at 4. With respect to solicitation, plaintiffs allege that SBLS and LSNY would like to engage in such activity, that FWLS does engage in such activity, and that "[t]he solicitation restriction is one of several restrictions that prompted [FWLS] to reject LSC funding, and it has prevented the program from reapplying for LSC funding." *Id.* They allege that the class-action restriction has prevented SBLS "from bringing a class action on behalf of child care providers against the City of New York seeking money owed to them under a child care reimbursement program," *id.* at 5, and that "as a result of the attorneys' fee award restriction, SBLS has not been able to claim an attorneys' fee award on its client's behalf." *Id.* With respect to the latter two restrictions, plaintiffs purport that they "function 'as applied,' in the context of particular cases, to limit attorney speech in a manner that warps the proper

operation of the judiciary." Pls.' Mem. at 60. Despite plaintiffs' use of an as-applied label, their argument involving distortion of the legal system is substantively a facial challenge, which is addressed fully below. The Court also notes that unlike their as-applied challenges to the program integrity rules, plaintiffs have offered only minimal and largely speculative facts in support of their so-called as-applied challenges to these three restrictions. Finally, plaintiffs' assertion that they have been unable to solicit clients, engage in class actions or pursue attorney's fees is subsumed in their as-applied challenges to the program integrity rules. *See* Nov. 15, 2004 Tr. at 52 (in which plaintiffs' acknowledged that their as-applied challenge to the class-action restriction "implicates the rest of the conversation about the affiliate programs."). Since plaintiffs have not mounted separate viable as-applied challenges to the solicitation, attorney's-fees and class-action restrictions, the Court addresses only plaintiffs' facial challenges to these restrictions.

ance that the Government endorses the prohibited activities; (2) if so, are the regulations enacted by the LSC, specifically the 'separate personnel' and 'degree of separate facilities' program integrity requirements, properly drawn to address that interest considering the differences, such as they are, between the Title X proscriptions in *Rust* [*v. Sullivan*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) ] and the impact in this case on the legal profession and the attorney-client relationship[.]

*Velazquez I*, 985 F.Supp. at 337.

The Court answered each of these questions in the affirmative. In respect to the first question, it held that LSC's program integrity rules were, under *Chevron USA, Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), a permissible construction and implementation of the Act. As for the second question, it held that the rules could not be struck down as facially unconstitutional. In that regard, the Court noted, initially, that "when dealing with an interest that is viewpoint neutral and not aimed at suppressing vital, fundamental constitutional rights, the Government need only show a 'fit' between the legislature's ends and the means chosen to accomplish these ends . . . that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective." *Velazquez I*, 985 F.Supp. at 340 (citations and quotations omitted; alterations in original). The Court viewed that as "the proper standard to apply when evaluating whether regulations are properly drawn to protect the Government's interest in avoiding the perception of endorsement of programs which it does not subsidize," *id.*, and held that the program integrity rules met that standard because they were neither vague nor overbroad; moreover, plaintiffs did not demonstrate that they never could be applied in a valid manner. As it explained, quoting from *Rust:* "A facial challenge . . . is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that [the regulations] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render [them] wholly invalid." *Id.* at 341 (internal citation omitted).

In the course of rejecting the facial challenge to the program integrity rules, the Court disagreed with plaintiffs' contention "that the profanity of the lawyering restrictions here at issue . . . affect the fundamental nature of lawyering and the attorney-client relationship[,]" *id.* at 342, since the Court did not view the restrictions as "significantly imping[ing]" on this relationship because under LSC's regulations the grantee-lawyer "may counsel the client, refer the client to another attorney, and explain to the client that LSC restrictions preclude the lawyer from engaging in the activity the client may wish to undertake." *Id.* at 343. The Court cautioned, however, that it would take "a critical view" of "any restrictions on . . . basic lawyering" and "any unreasonable rejections of recipients' certificates of compliance with the program integrity requirements, if such issues should arise in any future 'as applied' litigation." *Id.* at 343–44.

**b. The Circuit Court's Decision (*Velazquez II*)**

On appeal, plaintiffs renewed their *Chevron* and facial challenges to the program integrity rules. In addition, they raised facial challenges to a number of the Act's

restrictions.[11] The circuit court unanimously rejected plaintiffs' *Chevron* argument—that LSC was not authorized by Congress to allow for the creation of affiliate organizations as alternative channels for the unrestricted use of non-LSC funds, and that the program integrity rules did not represent a permissible construction of the Act; therefore, it affirmed the district court in that respect. *See Velazquez II,* 164 F.3d at 763–64.

Prior to addressing the facial challenge to the program integrity rules, the circuit court unanimously declined plaintiffs' invitation to determine whether the traditional lawyer-client relationship enjoyed constitutional protection because it determined, as did the district court, that "grantee lawyers are bound to explain to prospective and actual clients the limitations imposed by the 1996 restrictions, and may refer clients to lawyers unencumbered by the restrictions"; consequently, there was "no reason to fear that clients will detrimentally rely on their LSC lawyers for a full range of legal services." *Id.* at 764.

Turning to the program integrity rules, the circuit court unanimously concluded, as did the district court, that they were not facially unconstitutional. In doing so, it rejected plaintiffs' unconstitutional-conditions argument "that the program integrity rules contained in the final regulations unreasonably burden a grantee's ability to use nonfederal funds," because it construed the leading unconstitutional-conditions cases—*Regan v. Taxation With Representation,* 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (*"TWR"*), *FCC v. League of Women Voters,* 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984), and *Rust*—to stand for the proposition that "in appropriate circumstances, Congress may burden the First Amendment rights of

recipients of government benefits if the recipients are left with adequate alternative channels for protected expression." *Id.* at 766. In so holding, it viewed *Rust* as the least relevant because there "the speech restriction" was "very narrow; it was limited to speech at odds with the values Congress was seeking to advance through its grant program[,]" noting that the Supreme Court, in commenting on *Rust* in *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), explained that "[w]hen the government disburses public funds to private entities to convey a governmental message, it may … ensure that its message is neither garbled nor distorted by the grantee." *Velazquez II,* 164 F.3d at 766 (quoting *Rosenberger,* 515 U.S. at 833, 115 S.Ct. 2510).

The circuit court reasoned, therefore, that *Rust* was "unlike the present case" because "[t]he restrictions here placed on grantees are not narrow; they are extremely broad" since "[g]rantees are prohibited outright from engaging in attempts to influence government's adoption of laws[,]" and "the justification that prevailed in *Rust*—avoiding the distortion or dilution of the very government message advanced by the program"—did not "have any bearing here." *Id.* Consequently, the court did not believe that *Rust* "compelled the conclusion that the program integrity rules[,]" although modeled after those in *Rust,* "necessarily allow adequate avenues for protected expression in statutory or factual contexts where the burden on speech may be more significant or where the relationship between the burden and the government benefit may be more attenuated." *Id.*

11. The district court did not identify these facial challenges as being presented by plaintiffs' preliminary injunction motion; accordingly it did not address them.

Nonetheless, the circuit court rejected plaintiffs' facial challenge to the program integrity rules because plaintiffs "failed to establish that no set of circumstances exists under which the Act would be valid," *id.* at 767 (internal citation and quotations omitted), since "[i]t appears likely that LSC grantees with substantial non-federal funding can provide the full range of restricted activity through separately incorporated affiliates without serious difficulty." *Id.*

The circuit court then addressed plaintiffs' final claim—"that the Act discriminates against certain speech on the basis of viewpoint and is therefore unconstitutional even as applied to the use of federal monies." *Id.* The court gleaned from the plaintiffs' submissions that it "appear[ed] that plaintiffs direct[ed] this argument against the lobbying provisions and the welfare reform provision of the Act." *Id.*

In respect to the lobbying restrictions, which encompassed legislation, agency-adjudication and executive-order restrictions, the court unanimously concluded that they were "based on subject matter, not viewpoint[,]" and that "Congress may discriminate on the basis of the subject matter of grantees' expression, because such discrimination properly confine[s the LSC program] to the limited and legitimate purposes for which it was created." *Id.* at 768 (internal citation and quotations omitted; alterations in original). As for the legislation component, the court explained that "[w]hile this language impuses a sweeping restriction on grantee activity, it burdens no particular viewpoint and favors neither speech in support of legislative action nor speech opposed[ ]" because "it prohibits the grantee from attempt[ing] to influence *the passage or defeat* of a legislative or constitutional initiative[.]" *Id.* (citation and quotations omitted; alterations and emphasis

in original). The court applied the same logic to the agency-adjudication aspect of the lobbying restrictions, finding it viewpoint neutral because "the restriction permits grantees to participate on neither side of a rule-creating adjudicatory proceeding." *Id.* As for the executive-order restriction, the court interpreted it to simply "define a limitation on program content, without favoring policy continuity over change or otherwise discriminating against any viewpoint[,]" *id.;* consequently, it "d[id] not suppress ideas but merely prohibit[ed] a project grantee ... from engaging in activities outside the project's scope." *Id.* (internal citations and quotations omitted; alterations in original).

Turning to the welfare-reform restriction, section 504(a)(16) of the Act, the court noted that it contained four categories of prohibited activities "involving an effort to reform a Federal or State welfare system[.]" *Id.* The court unanimously found all of them viewpoint neutral because they did not distinguish between those who supported or opposed any proposed reform. *See id.* at 769.

There was, however, another aspect of the welfare-reform restriction that split the court. It provided that a grantee may represent "an eligible client who is seeking relief from a welfare agency[,]" but only if "such relief does not involve an effort to amend or otherwise challenge existing law in effect on the date of the initiation of representation...." *Id.* The majority held that this "suits-for-benefits" exception was not viewpoint neutral because "[i]t accords funding to those who represent clients without making any challenge to existing rules of law, but denies it to those whose representation challenges existing rules." *Id.* at 769–70. Noting that "different types of speech enjoy different degrees of protection under the First Amendment[,]" *id.* at 771, it reasoned that "a lawyer's

argument to a court that a statute, rule, or governmental practice standing in the way of a client's claim is unconstitutional or otherwise illegal falls far closer to the First Amendment's most protected categories of speech than abortion counseling or indecent art[,]" *id.*, viewing this as analogous to a prohibition "calculated to drive certain ideas or viewpoints from the marketplace" because "[i]t muzzles grant recipients from expressing any and all forbidden arguments." *Id.* at 772 (internal citation omitted). Because this provision was viewpoint discrimination, it was subject to "strict First Amendment scrutiny," which it could not survive. *Id.*

Although the circuit court gave content to the concept of viewpoint neutrality in passing upon the constitutionality of the lobbying and welfare-reform restrictions, it did not apparently address any of the three restrictions which plaintiffs now facially challenge to determine if they were viewpoint based, or otherwise constitutionally infirm.[12]

## c. The Supreme Court's Decision (*Velazquez III*)

The constitutionality of the "suits-for-benefits" exception to the welfare-reform restriction was the only issue before the Supreme Court. The 5–4 majority affirmed the circuit court's holding that it constituted viewpoint discrimination. Echoing the circuit court's take on *Rust*, it

explained that "viewpoint-based funding decisions can be sustained in instances in which the government is itself the speaker, or instances, like *Rust*, in which the government used private speakers to transmit specific information pertaining to its own program[,]" *Velazquez III*, 531 U.S. at 541, 121 S.Ct. 1043, invoking, as did the circuit court, its holding in *Rosenberger*, that "when the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee." *Id.* (quoting *Rosenberger*, 515 U.S. at 833, 115 S.Ct. 2510). It reasoned, conversely, that "[n]either the latitude for government speech nor its rationale applies to subsidies for private speech ... when the government does not itself speak or subsidize transmittal of a message it favors...." *Id.* at 542, 121 S.Ct. 1043 (internal citations and quotation omitted).

The Supreme Court held that the LSC program, unlike the program in *Rust*, was "designed to facilitate private speech, not to promote a governmental message[,]" because "an LSC-funded attorney speaks on the behalf of the client[,]" not the Government, *id.*; therefore, "[t]he advice from the attorney to the client and the advocacy by the attorney to the courts cannot be classified as governmental speech even under a generous understanding of the concept."

**12.** LSC contends that the circuit court passed upon plaintiffs' challenges to these three restrictions because the court listed in a footnote certain restrictions that plaintiffs "do not challenge[,]" and excluded these three restrictions from its list because it somehow "understood that the plaintiffs were challenging much, much more than just the lobbying restriction[.]" Nov. 15, 2004 Tr. at 44. This conclusion is not warranted. Although the footnote in question explained that plaintiffs "do not challenge" restrictions on "activity involving political redistricting" and "litiga-

tion with respect to abortion[,]" *Velazquez II*, 164 F.3d at 760 n. 2 (internal citations and quotations omitted), as noted, with respect to viewpoint discrimination, the circuit court explicitly stated that "it appears that plaintiffs direct this argument against the lobbying provisions and the welfare reform provisions of the Act." *Id.* at 767. Thus, it does not appear that the circuit court believed that plaintiffs' argument that the class-action, attorney's-fees and solicitation restrictions are viewpoint based was before it.

*Id.* at 542–43, 121 S.Ct. 1043. As it further explained: "There can be little doubt that the LSC Act funds constitutionally protected expression; and in the context of this statute there is no programmatic message of the kind recognized in *Rust* and which sufficed there to allow the Government to specify the advice deemed necessary for its legitimate objectives." *Id.* at 548, 121 S.Ct. 1043.

Having concluded that the challenged restriction could not be upheld on the basis that the Government was the speaker or the sponsor of a programmatic message, the Court reasoned:

> The private nature of the speech involved here, and the extent of LSC's regulation of private expression, are indicated further by the circumstance that the Government seeks to use an existing medium of expression and to control it, in a class of cases, in ways which distort its usual functioning. Where the government uses or attempts to regulate a particular medium, we have been informed by its accepted usage in determining whether a particular restriction on speech is necessary for the program's purposes and limitations.

*Id.* at 543, 121 S.Ct. 1043.

The Court therefore drew analogies from limited forum caselaw because the subsidization of legal services entities "presumes that private nongovernmental speech is necessary, and a substantial restriction is placed upon that speech." *Id.* at 544, 121 S.Ct. 1043. Turning to the challenged "suits-for-benefits" exception to the welfare-reform restriction, the Court explained:

> By providing subsidies to LSC, the Government seeks to facilitate suits for benefits by using the state and federal courts and the independent bar on which those courts depend for the proper performance of their duties and responsibil-

ities. Restricting LSC attorneys in advising their clients and in presenting arguments and analyses to the courts distorts the legal system by altering the traditional role of the attorneys in much the way broadcast systems or student publication networks were changed in th[ose] limited forum cases we have cited. Just as government in those cases could not elect to use a broadcasting network or a college publication structure in a regime which prohibits speech necessary to the proper functioning of those systems, it may not design a subsidy to effect this serious and fundamental restriction on advocacy of attorneys and the functioning of the judiciary."

*Id.* (internal citations omitted).

Notably, the Court elicited a concession from the Government that "upon determining a question of statutory validity is present in any anticipated or pending case or controversy, the LSC-funded attorney must cease representation at once"; moreover, "[t]his [was] true whether the validity issue bec[a]me[ ] apparent during initial attorney-client consultation or in the midst of litigation proceedings" so that if "a judge were to ask an LSC attorney whether there was a constitutional concern, the LSC attorney simply could not answer." *Id.* at 544–45, 121 S.Ct. 1043. Therefore, "the restriction ... threaten[ed] severe impairment of the judicial function" because it "sift[ed] out cases presenting constitutional challenges in order to insulate the Government's laws from judicial inquiry[,]" resulting in "two tiers of cases." *Id.* at 546, 121 S.Ct. 1043. The Court concluded that "[a] scheme so inconsistent with accepted separation-of-powers principles [was] an insufficient basis to sustain or uphold the restriction on speech" because "[t]he statute [was] an attempt to draw lines around the LSC program to exclude from litigation those arguments and theo-

ries Congress finds unacceptable but which by their nature are within the province of the courts to consider." *Id.*

The Court viewed this restriction on speech as "even more problematic" because in cases where the attorney [would have to] withdraw[,] the client [was] unlikely to find other counsel[,]" *id.;* thus, "[t]here often w[ould] be no alternative source ... to receive vital information respecting constitutional and statutory rights bearing upon claimed benefits[,]" meaning that "with respect to the litigation services Congress has funded, there [would be] no alternative channel for expression of the advocacy Congress seeks to restrict." *Id.* at 546–47, 121 S.Ct. 1043. In sum, the Court concluded:

> Congress was not required to fund an LSC attorney to represent indigent clients; and when it did so, it was not required to fund the whole range of legal representations or relationships. The LSC and the United States, however, in effect ask us to permit Congress to *define the scope of the litigation it funds to exclude certain vital theories and ideas.* The attempted restriction is designed to insulate the Government's interpretation of the Constitution from

judicial challenge.... Where private speech is involved, even Congress' antecedent funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest.

*Id.* at 548–49, 121 S.Ct. 1043 (emphasis added).

Plaintiffs construe *Velazquez III* as bringing within the sweep of impermissible viewpoint-based restrictions on private speech the distortion of the legal system through curtailment of the traditional role of lawyers and impairment of the judicial function. *See* Pls.' Mem. at 8. They argue that the class-action, attorney's-fees and solicitation restrictions distort the legal system and, therefore, must be struck down under the First Amendment.

The proper reading of *Velazquez III* and the breadth of its reach has divided legal commentators. Some have interpreted it narrowly as simply holding that traditional viewpoint-based restrictions are improper when the Government does not itself speak or subsidize a particular message.[13] Others read it more broadly as creating a new "distortion doctrine."[14] Still others see it as resting on a combination of traditional

---

13. *See, e.g.,* Shirley K. Garcia, Case Notes, *Legal Services Corporation v. Velazquez: A Correct Application of the U.S. Supreme Court's First Amendment Limited Public Forum Analysis,* 24 U. Haw. L.Rev. 331, 344 (2001) ("The decision reaffirmed the Court's traditional position that viewpoint-based discrimination against private speech, regardless of the forum, is presumptively unconstitutional."); Jeffrey VanHoorweghe, Comment, *Legal Services Corporation v. Velazquez: The Supreme Court's Missed Opportunity to Clarify the Viewpoint Discrimination Doctrine's Role in Subsidized Speech Cases,* 50 Cath. U.L.Rev. 539, 579 (2001) ("[I]f the government is not speaking, but funding private speech, viewpoint-based restrictions are not valid.").

14. *See, e.g.,* Christopher A. Gozdor, Note, *Legal Services Corporation v. Velazquez: A Pro-*

blematic Commingling of Unconstitutional Conditions and Public Fora Analyses Yields a New Grey Area for Free Speech, 61 Md. L.Rev. 454, 468 (2002) (interpreting the holding as "subsidies for private speech violate free speech rights when the government attempts to control an existing medium of expression in ways which distort its usual functioning." (internal quotations omitted)); Christian Hammond, Comment, *The Supreme Court's Decision in Legal Services Corporation v. Velazquez and the Analysis Under the Unconstitutional Conditions Doctrine,* 79 Denv. U.L.Rev. 157, 169 (2001) (arguing that instead of following traditional viewpoint analysis, "the majority relied on the imprecise theory that the 'suit-for-benefits' restriction distorted the role of attorneys in the judicial system.").

viewpoint analysis and distortion analysis.[15]

### d. The Supreme Court's Decision in *American Library Ass'n*

The import of the language in *Velazquez III* addressing the distortion of the legal system was recently debated by the Supreme Court in *American Library Ass'n*, which involved a First Amendment challenge to the Children's Internet Protection Act's requirement that public libraries use Internet filters as a condition for the receipt of federal subsidies. Plaintiffs there relied on *Velazquez III* to support their contention that the filtering requirement imposed unconstitutional conditions that "[d]istor[t] the [u]sual [f]unctioning of [p]ublic [l]ibraries." *American Library Ass'n*, 539 U.S. at 213, 123 S.Ct. 2297 (alteration in original). In rejecting this argument, the four-judge plurality advanced a narrow reading of *Velazquez III*:

> In *Velazquez*, the Court concluded that a Government program of furnishing legal aid to the indigent differed from the program in *Rust* '[i]n th[e] vital respect' that the role of lawyers who represent clients in welfare disputes is to advocate *against* the Government, and there was thus an assumption that counsel would be free of state control. The Court concluded that the restriction on advocacy in such welfare disputes would distort the usual functioning of the legal profession and the federal and state courts before which the lawyers appeared. Public libraries, by contrast, have no comparable role that pits them against the Government, and there is no comparable assumption that they must be free of any conditions that their benefactors might attach to the use of donated funds or other assistance.

*Id.* (internal citation omitted; alterations and emphasis in original).[16] Because it viewed the key issue in *Velazquez III* as advocacy against the Government, the plurality concluded that "*Velazquez* held only that viewpoint-based restrictions are improper when the [government] does not itself speak or subsidize a message it favors *but instead expends funds to encourage a diversity of views from private speakers.*" *Id.* at 213 n. 7, 123 S.Ct. 2297 (internal citation and quotations omitted; alterations and emphasis in original).

Justice Kennedy and Justice Breyer filed separate concurring opinions; Justice Stevens and Justice Souter filed separate dissenting opinions, with Justice Ginsburg joining Justice Souter's opinion. Neither Justice Kennedy nor Justice Breyer in their concurring opinions, nor Justice Souter in his dissenting opinion, mentioned *Velazquez III*. Justice Stevens argued in his dissenting opinion that the filtering requirement was an impermissible attempt by the Government "to impose controls on an important medium of expression[,]" citing *Velazquez III* for the proposition that "when the Government seeks to use an existing medium of expression and to control it, in a class of cases, in ways which distort its usual functioning, the distorting restriction must be struck down under the First Amendment." *Id.* at 227–28, 123

---

15. *See, e.g.,* Carrie S. Bernstein, Comment, *Legal Services Corporation v. Velazquez: The Court's Missed Opportunity to Clarify the Legal Framework for Examining the Constitutionality of Government Program Restrictions,* 79 Denv. U.L.Rev. 137, 145–46 (2001) (concluding that the Court struck down the "suits-for-benefits" provision both because "[v]iewpoint based restrictions are improper when the government program was designed to facilitate private speech[,]" and because of "[t]he important role lawyers play in society[.]")

16. The four justices who made up the plurality in *American Library Ass'n* were the dissenters in *Velazquez III*.

S.Ct. 2297 (internal quotations omitted). Justice Stevens therefore took issue with "the plurality's narrow reading" of *Velazquez III,* commenting that "*Velazquez* is not limited to instances in which the recipient of Government funds might be 'pit[ted]' against the Government. To the contrary, we assessed the issue in *Velazquez* by turning to, and harmonizing it with, our prior unconstitutional condition cases in the First Amendment context." *Id.* at 228 n. 5, 123 S.Ct. 2297 (internal citation omitted; alterations in original).

Prior to the November 15, 2004 oral argument, the Court instructed the parties to address the standard to be applied to plaintiffs' facial challenges in light of the references in *American Library Ass'n* to *Velazquez III. See* Order dated Nov. 8, 2004 at 6–7. Plaintiffs responded that "[i]n *American Library Association,* the plurality and dissenting opinions disagree whether [*Velazquez III* ] extends to librarians' speech. That disagreement has no bearing on the instant case because the plaintiffs here are lawyers, not librarians, and so *Velazquez* [*III* ] clearly applies to them." Letter from Burt Neuborne on behalf of plaintiffs (Nov. 12, 2004) at 3 (internal citation omitted). Furthermore, plaintiffs questioned whether the plurality's discussion of *Velazquez III* had any controlling effect because it was "only one of several concurring opinions, each unable to attract a majority of the Court"; thus, the holding should be viewed as the position "taken by Justice Kennedy," because that was the "position taken by those Members who concurred in the judgments on the narrowest grounds." *Id.* Consequently, as shown by the following colloquy at oral argument, plaintiffs maintained their position that *Velazquez III* should be read to broaden the definition of viewpoint-based regulation of speech to include restrictions that distort the legal system:

THE COURT: And the question is how do we assess viewpoint neutrality? I read your papers as suggesting that if there's an imposition upon the legal function or the Court's function or lawyering in the broader sense of the word, that means that this is no longer viewpoint neutral. I think that's what you're trying to tell me here in your submissions. Do I read you correctly?

MR. NEUBORNE: I think that's a fair summary of it. When one lawyer—in a courtroom with two adversary lawyers fighting with each other, when the effect of a government restriction is to significantly restrict the ability of one of the lawyers to utilize the traditional tools of lawyering, that inevitably skews the outcome of the case.

Nov. 15, 2004 Tr. at 37.

With respect to *American Library Ass'n,* the Court agrees with plaintiffs that because no single rationale enjoyed the assent of five justices, "the holding of the Court may be viewed as that position taken by those members who concurred in the judgments on the narrowest grounds." *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). In his concurrence, Justice Kennedy concluded that "there is little to this case" because libraries have the capacity to unblock Web sites and disable filters; therefore, "an adult user's election to view constitutionally protected Internet material" was not burdened in any "substantial way." *American Library Ass'n,* 539 U.S. at 214–15, 123 S.Ct. 2297. The plurality agreed, noting that "[a]ssuming that ... erroneous blocking presents constitutional difficulties, any such concerns are dispelled by the ease with which patrons may have the filtering software disabled." *Id.* at 209, 123 S.Ct. 2297. Thus, aside from the narrow holding that the filtering scheme was saved from any constitutional infirmity by

a librarian's ability to turn off filters, the most the Court can glean from *American Library Ass'n* is that four justices took a very narrow reading of the holding in *Velazquez III*, limited to instances in which the recipient of government funds was pitted against the government, while one justice took the broad reading propounded by plaintiffs.

Based on its own close reading of *Velazquez III*, the Court is constrained to reject plaintiffs' broad interpretation. As an initial matter, the "suits-for-benefits" restriction fell squarely within the traditional definition of viewpoint-based regulation of speech. Tellingly, the Supreme Court significantly relied on *Rosenberger* in striking down that provision. *See Velazquez III*, 531 U.S. at 541–43, 121 S.Ct. 1043. In *Rosenberger*, the Court explained that a regulation will be deemed to be viewpoint based "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction" on speech. *Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510. The "suits-for-benefits" restriction prohibited LSC attorneys from advancing a specific ideology, opinion or perspective; under this restriction, the LSC attorney was free to represent an indigent client if he or she was willing to accept the validity of the welfare law under which the client's claim was brought, but the attorney was prohibited from representing the same client if the claim involved a challenge to the constitutionality of the welfare law. Thus, when the Supreme Court in *Velazquez III* referenced the distortion of the legal system, it had no need to broaden the traditional definition of viewpoint-based regulation of speech because the "suits-for-benefits" restriction fit neatly within that definition. Instead, the majority opinion raised the specter of distortion only to bolster its characterization of LSC grantees' speech as private speech and to highlight the ex-

tent to which that private speech was being regulated. *See Velazquez III*, 531 U.S. at 543, 121 S.Ct. 1043 ("The private nature of the speech involved here, and the extent of LSC's regulation of private expression, *are indicated further* by the circumstance that the Government seeks to use an existing medium of expression and to control it, in a class of cases, in ways which distort its usual functioning." (emphasis added)). Accordingly, the Court will apply traditional viewpoint analysis to plaintiffs' facial First Amendment claims.

■ To prevail on these challenges, plaintiffs "must prove that the restrictions ... at least implicate [their] constitutional rights." *Legal Aid Society of Hawaii v. Legal Services Corp.*, 961 F.Supp. 1402, 1408 (D.Haw.1997) (*"LASH I"*). In the context of a government subsidy, if a restriction implicates First Amendment activities, the Government may nonetheless restrict a grantee's ability to engage in such activities, so long as it allows for adequate alternative channels. *See, e.g., Legal Aid Society of Hawaii v. Legal Services Corp.*, 145 F.3d 1017, 1025 (9th Cir. 1998) (*"LASH III"*) ("[T]he LSC regulations do not force a recipient to give up prohibited activities, they merely require that the [grantee] keep such activities separate and distinct from [LSC] activities." (internal citations and quotations omitted)).

■ However, as *Velazquez III* teaches, even when adequate alternative channels are provided for, a restriction on private speech may be struck down if it is viewpoint based. In *Velazquez III*, the Supreme Court analyzed the LSC program under both its "unconstitutional-conditions" and "limited-public-forum" lines of authority. Under the unconstitutional-conditions cases, a government exemption must be "rational" and may not "aim[ ] at

the suppression of dangerous ideas." *Boy Scouts of America v. Wyman*, 335 F.3d 80, 91–92 (2d Cir.2003) (quoting *TWR*, 461 U.S. at 540, 103 S.Ct. 1997) (alterations in original). Under limited-public-forum caselaw, "[r]estrictions on speech not within the type of expression allowed ... must only be reasonable and viewpoint neutral." *Make The Road by Walking, Inc. v. Turner*, 378 F.3d 133, 143 (2d Cir.2004).[17] Thus, whether they are viewed as unconstitutional conditions on the LSC subsidy or as denying access to a limited public forum, the class-action, attorney's-fees and solicitation restrictions will survive plaintiffs' facial challenges, even if they implicate First Amendment rights, if they are viewpoint neutral and reasonable. *See Wyman*, 335 F.3d at 92 ("The case before us lies at the intersection of [the nonpublic-forum and unconstitutional-conditions] lines of authority and it makes no difference under which line we analyze it. Whether viewed as denial of access to a nonpublic forum or as the denial of a government benefit, the ... exclusion is constitutional if and only if it was (1) viewpoint neutral and (2) reasonable."). As noted, under *Rosenberger*, a restriction is not viewpoint neutral if "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction[ ]" on speech. 515 U.S. at 829, 115 S.Ct. 2510.

## 2. Class–Action Restriction

The Act prohibits LSC from funding any organization "that initiates or participates in a class action suit." § 504(a)(7). LSC's implementing regulations provide, *inter alia*, that "[r]ecipients are prohibited from initiating or participating in any class action." 45 C.F.R. § 1617.3.

With respect to whether the class-action restriction implicates First Amendment rights, in *LASH I* the court "question[ed] whether the First Amendment right to associate for the purpose of engaging in litigation as a form of political expression extends to class actions." *LASH I*, 961 F.Supp. at 1410. Because "[n]o appellate court has previously extended First Amendment protections to class actions despite encouragement from scholars[,]" the *LASH I* court found it "imprudent to constitutionalize the rules of civil procedure" by recognizing a First Amendment right to engage in class actions. *Id.* Legal commentators have, however, suggested that the class-action mechanism confers substantive rights worthy of constitutional protection. *See, e.g.*, John Leubsdorf, *Constitutional Civil Procedure*, 63 Tex. L.Rev. 579, 617 (1984).

▮ Assuming that the class-action restriction implicates First Amendment rights, it can fairly be argued that the restriction has a significant impact on the legal system and, in particular, on core functions of the courts. For example, the restriction will result in issues being presented to the courts in a piecemeal manner in multiple, individual cases rather than being economically presented in a single action. Nonetheless, in light of the Court's interpretation of *Velazquez III*, it is constrained to reject plaintiffs' argument that the restriction is impermissibly viewpoint based because it distorts the legal system. Nor have plaintiffs demonstrated how, under *Rosenberger's* formulation of viewpoint-based regulation of speech, the

---

**17.** A limited public forum arises "where the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *Turner*, 378 F.3d at 143 (citations and quotations omitted). The requirement that restrictions on speech be viewpoint neutral and reasonable applies in both limited public and non-public fora. *See id.*

restriction targets the "specific motivating ideology or the opinion or perspective of the speaker." 515 U.S. at 829, 115 S.Ct. 2510. Accordingly, the Court concludes that the class-action restriction is viewpoint neutral.

So long as it is viewpoint neutral, a restriction "need only be reasonable; it need not be the most reasonable or the only reasonable limitation." *Wyman*, 335 F.3d at 97 (citation and quotations omitted). As LSC explained in its commentary to the regulation implementing the class-action restriction, "[t]he legislative history of [§ 504(a)(7)] indicates an intent that legal services programs should focus their resources on the representation of individual poor clients and not be involved in any class actions." Class Actions, 61 Fed.Reg. 63,754 (1996); *see also* H.R.Rep. No. 104–196 (1995) at *120 (In discussing justifications for the class-action and other restrictions, the Committee "underst[ood] that advocacy on behalf of poor individuals for social and political change is an important function in a democratic society[,]" but did "not believe that such advocacy is an appropriate use of Federal funds[,]" noting that "there are hundreds of private organizations which can and do fulfill this advocacy role ... [and] any funding devoted to advocacy is funding taken away from basic legal assistance."). In light of this legislative intent, the Court cannot conclude that the class-action restriction is unreasonable.

### 3. Attorney's–Fees Restriction

Section 504(a)(13) of the Act proscribes the use of federal subsidies to provide financial assistance to an entity "that claims (or whose employee claims), or collects and retains, attorney's fees pursuant to any Federal or State law permitting or requiring the awarding of such fees." LSC's implementing regulations provide, *inter alia,* that "no recipient or employee

of a recipient may claim, or collect and retain attorneys' fees in any case undertaken on behalf of a client of the recipient." 45 C.F.R. § 1642.3.

 Attorney's fees are largely a creature of statute, and it is difficult to conceptualize how the attorney's-fees restriction implicates First Amendment rights. Nonetheless, assuming that it does, plaintiffs' argument that the restriction is viewpoint based because it "warp[s] the judicial process," Pls.' Mem. at 66, is unavailing under the Court's interpretation of *Velazquez III,* and plaintiffs have not shown how the restriction targets a particular ideology, opinion or perspective. Accordingly, the Court deems it to be viewpoint neutral.

Nor have plaintiffs shown the attorney's-fees restriction to be unreasonable. In proposing the restriction, the House Committee noted:

Federally-funded legal aid programs should serve as a catalyst, not a replacement, for private bar activity. The Committee believes that cases which provide an opportunity for the collection of attorneys fees can be serviced by the private bar. Further, the Committee notes that [LSC] grantees are supported by public resources in order to provide free legal aid to their clients. Therefore, the Committee believes it is inappropriate for attorneys fees to be collected for free legal aid.

H.R.Rep. No. 104–196 at *120. In light of this legislative intent to have LSC-funded attorneys focus on cases that would not otherwise be pursued by the private bar, the Court cannot say that the attorney's-fees restriction is unreasonable.

### 4. Solicitation Restriction

Under the Act, LSC grantees must agree that they "will not accept employment resulting from in-person unsolicited

advice to a nonattorney that such nonattorney should obtain counsel or take legal action, and will not refer such nonattorney to another [grantee] or an employee of the [grantee], that is receiving financial assistance provided by the Corporation." § 504(a)(18). LSC's implementing regulations provide, *inter alia,* that "[r]ecipients and their employees are prohibited from representing a client as a result of in-person unsolicited advice." 45 C.F.R. § 1638.3(a). Under this regulation, "in-person" is defined as a "face-to-face encounter or a personal encounter via other means of communications such as a personal letter or telephone call." 45 C.F.R. § 1638.2(a). "Unsolicited advice" is defined as "advice to obtain counsel or take legal action given by a recipient or its employee to an individual who did not seek the advice and with whom the recipient does not have an attorney-client relationship." 45 C.F.R. § 1638.2(b). These regulations permit certain community legal education activities. In particular, § 1638.4 allows grantees to

> provid[e] information regarding legal rights and responsibilities or provid[e] information regarding the recipient's services and intake procedures through community legal education activities such as outreach, public service announcements, maintaining an ongoing presence in a courthouse to provide advice at the invitation of the court, disseminating community legal education publications, and giving presentations to groups that request them ...

and to represent individuals seeking legal assistance as a result of providing such information.

With respect to whether the solicitation restriction implicates the First Amendment, the Court notes, initially, that plaintiffs greatly overstate the restriction's reach. Although plaintiffs contend that the restriction prevents grantees from engaging in "outreach to disadvantaged persons, educating those individuals and families about their legal rights and remedies, and then offering to represent them for free," Pls.' Mem. at 54, the regulations explicitly permit such activities. *See* 45 C.F.R. § 1638.4. Although the impact on plaintiffs' First Amendment rights is less far-reaching than plaintiffs suggest, *In re Primus,* 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978), and *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), recognize that solicitation of prospective litigants by nonprofit organizations that engage in litigation as a form of political expression and association is expressive and associational conduct entitled to First Amendment protection. *See In re Primus,* 436 U.S. at 421–24, 98 S.Ct. 1893; *Button,* 371 U.S. at 429–30, 83 S.Ct. 328.

■ Although the solicitation restriction implicates the First Amendment, it is nonetheless viewpoint neutral. As with their arguments regarding the class-action and attorney-fee's restrictions, plaintiffs' argument that the solicitation restriction is viewpoint based because it distorts the legal system, *see* June 16, 2004 Tr. at 37, is unavailing. Plaintiffs also argue that the restriction is viewpoint based because "the lawyer can receive the government funding only if the lawyer has abstained from advising [a] client to enforce his legal rights," Pls.' Mem. Reply Gov't's Opp. Prelim. Inj. ("Pls.' Reply Mem.") at 52. Whether a lawyer has advised a client of his or her rights is different from targeting a particular ideology, opinion or perspective.

With respect to reasonableness, the solicitation restriction was intended to ensure that LSC grantees focus on providing core legal services to their clients rather than on spending time trying to solicit new clients. *See* H.R.Rep. No. 104–196 at *121 ("[T]he Committee finds it unacceptable

for any Federally-funded legal aid program to solicit clients at a time when [LSC] and the legal aid community continue to testify that they must turn away eligible clients away due to lack of resources."). Given this legislative intent, the Court cannot say that the solicitation restriction is unreasonable.

## C. The As–Applied Challenges

### 1. Standing

LSC challenges the plaintiff-grantees' standing to bring their as-applied challenges to the program integrity rules.

■■■■ "As a general rule, to establish standing to challenge an allegedly unconstitutional policy, a plaintiff must submit to the challenged policy. This threshold requirement for standing may be excused only where a plaintiff makes a substantial showing that application for the benefit would have been futile." *Prayze FM v. FCC*, 214 F.3d 245, 251 (2d Cir.2000) (internal quotations and citations omitted). Plaintiff-grantees' submission of their Clarified Proposal confers standing to challenge its rejection. *See, e.g., id.* (submission of application for license to the FCC would have been sufficient to confer standing); *Bach v. Pataki*, 289 F.Supp.2d 217, 223 (N.D.N.Y.2003) (discussing how application for a permit confers standing to challenge permit scheme). In addition to suffering this "injury-in-fact," they clearly meet the other constitutional standing requirements, and prudential standing is not implicated. *See Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998) ("An as-applied challenge does not implicate the enforcement of the law against third parties.").

■■■■ The as-applied challenges are also ripe for judicial determination. *See Marchi v. Board of Coop. Educ. Servs.*, 173 F.3d 469, 478 (2d Cir.1999) ("For a case to be deemed justiciable under Article III, it must be ripe. Indeed, ripeness is a constitutional prerequisite to exercise of jurisdiction by federal courts." (internal quotations and citations omitted)); *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds, Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977) (ripeness requirement is intended "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements"). The Clarified Proposal is hardly abstract; therefore, LSC's rejection of the proposal renders the as-applied challenges "fit for judicial consideration"; moreover, "withholding of consideration will cause substantial hardship to the parties." *United States v. Balon*, 384 F.3d 38, 46 (2d Cir. 2004) (internal citations and quotations omitted). Furthermore, "in the First Amendment context, the ripeness doctrine is somewhat relaxed[,]" *Dougherty v. Town of North Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 90 (2d Cir.2002), because of the "fear of irretrievable loss." *Id.* (quoting 13A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3532.3 (1984)).

### 2. The Undue Burden Test

Although the Second Circuit in *Velazquez II* opened the door to the present as-applied challenges by affording grantees of LSC funds the opportunity to demonstrate that the program integrity rules "in fact unduly burden [their] capacity to engage in protected First Amendment activity[,]" 164 F.3d at 767, it did not explain how the undue burden test should be applied in order to determine whether government-imposed restrictions on the creation of alternative channels unreasonably burden a grantee's ability to use non-fed-

eral funds to engage in restricted activities. It is now necessary to do so. There is, however, no caselaw addressing this precise issue.

At oral argument, plaintiff-grantees proposed a "weighted balancing test[,]" June 16, 2004 Tr. at 11,[18] requiring the Court to weigh the nature of the First Amendment rights burdened against the interests of the Government in creating the burdens. They argue that the balance tips in their favor because the Government "has imposed a significant burden" upon their First Amendment rights "without a real justification. . . ." *Id.* at 24.

LSC and the Government eschew a weighted balancing test. LSC urges a two-pronged inquiry: (1) "does the regulation fit the governmental interest[,]" and (2) "will the regulation make it effectively impossible for the grantee to actually exercise its constitutional rights through the alternative channel[.]" *Id.* at 23. The Government essentially agrees, stating that "so long as there is a fit between the government's purposes and the means by which the regulations at issue achieve that purpose, that is satisfactory[,]" *id.* at 19, noting that in determining the "fit," the Court can "take into account plaintiff[s'] alleged harm." *Id.* They collectively contend that the Supreme Court's decisions in *TWR, League of Women Voters* and *Rust* support their positions. *See, e.g.,* Mem. Intervenor–Def. Opp. Pls.' Mo. Prelim. Inj. at 20–21.

Notably, the Second Circuit's adoption of the undue burden standard was *dicta* since all that was before the court were facial challenges. The *dicta* evolved after the circuit court rejected plaintiffs' contention in support of their facial challenge to the program integrity rules that the "requirements of separate offices, equipment, libraries and personnel that grantees must meet in order to be able to speak through affiliates" imposed "extraordinary burdens that impermissibly impede grantees from exercising their First Amendment rights to associate with clients, to lobby, and to litigate." *Velazquez II,* 164 F.3d at 767 (internal citations and quotations omitted). As the Court previously noted, the circuit court rejected this facial challenge because "[p]laintiffs have . . . failed to establish that no set of circumstances exists under which the Act would be valid" since "[i]t appears likely that LSC grantees with substantial non-federal funding can provide the full range of restricted activity through separately incorporated affiliates without serious difficulty." *Id.* (internal citation omitted).[19]

The circuit court did not cite to any authority for this *dicta.* However, in *TWR,* the Supreme Court, although holding that "[i]t is not irrational for Congress to decide that tax exempt charities such as TWR should not further benefit at the expense of taxpayers at large by obtaining a further subsidy for lobbying[,]" 461 U.S. at 550, 103 S.Ct. 1997, noted "that TWR

---

**18.** In prior written submissions to the Court, plaintiff-grantees took the position that the Court must engage in something closer to strict scrutiny, relying on Supreme Court cases in which content-based restrictions on speech were being evaluated, *see* Pls.' Mem. at 21–24, 25, 38–39; such restrictions are not at issue here. *See, e.g., United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 812, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) (noting that "content-based burdens must sat-

isfy the same rigorous scrutiny as . . . content-based bans" on speech).

**19.** Of course, the issue in respect to plaintiff-grantees' as-applied challenges is not whether there may be "substantial non-federal funding" available at any point in time to "provide the full range of restricted activity," but whether the program integrity rules unduly burden plaintiff-grantees' right to create alternative channels with non-federal funds.

can obtain tax deductible contributions for its non-lobbying activity by returning to the dual structure it used in the past, with a § 501(c)(3) organization for non-lobbying activities and a § 501(c)(4) organization for lobbying." *Id.* at 544, 103 S.Ct. 1997. Although "TWR did not bring this suit because it was unable to operate with the dual structure[,]" *id.* at 544 n. 6, 103 S.Ct. 1997, the Court, in an effort to assuage the concern of some *amici* "that the IRS may impose stringent requirements that are unrelated to the congressional purpose of ensuring that no tax-deductible contributions are used to pay for substantial lobbying, and effectively make it impossible for a § 501(c)(3) organization to establish a § 501(c)(4) lobbying affiliate[,]" *id.,* commented:

> No such requirement in the code of regulations has been called to our attention. Nor have we been able to discover one. The IRS apparently requires only that the two groups be separately incorporated and keep records adequate to show that tax deductible contributions are not used to pay for lobbying. *This is not unduly burdensome."*

*Id.* (emphasis added).

Notably, in a concurring opinion, joined by Justices Brennan and Marshall, Justice Blackmun cautioned that "as long as the IRS goes no further" than to require separate incorporation and record keeping

from its § 501(c)(4) affiliate, there would be no constitutional infringement, but that "[a]ny significant restriction on this channel of communication . . . would negate the saving effect of § 501(c)(4)[,]" raising "insurmountable" First Amendment problems. *Id.* at 553, 103 S.Ct. 1997.

Consequently, the Court reads *TWR* as providing a foundation for the circuit court's *dicta* in *Velazquez II* embracing the undue burden standard for determining whether the Government has provided adequate alternative channels where it has imposed restrictions on First Amendment expressions as conditions for accepting federal subsidies. Since this *dicta* was obviously designed to guide the district court in the event of an as-applied challenge to the program integrity rules, the Court considers it "judicial dictum," rather than "obiter dictum," *see Bell,* 524 F.2d at 206, which it will follow.

In embracing the undue burden standard, the circuit court eschewed the taxonomic polarities of rational review and strict scrutiny, and chose an intermediate form of review, requiring the Court to engage in balancing the burdens imposed upon the plaintiff-grantees by LSC in the application of the program integrity rules, with its interests in doing so.[20]

In a useful article, written in 1993, the author, Curtis E. Harris, identified the

---

**20.** As one eminently regarded constitutional law scholar commented in a provocative article assessing the difference between judicial decisionmaking under the "twin masts" of strict scrutiny and rational review, and the "siren song of the sliding scale" inherent in balancing:

> Categorization and balancing each employ quite different rhetoric. Categorization is the taxonomist's style—a job of classification and labeling. When categorical formulas operate, all the important work in litigation is done at the outset. Once the relevant right and mode of infringement

have been described, the outcome follows, without any explicit judicial balancing of the claimed right against the government's justification for the infringement. Balancing is more like grocer's work (or Justice's)—the judge's job is to place competing rights and interests on a scale and weigh them against each other. Here the outcome is not determined at the outset, but depends on the relative strength of a multitude of factors.

Kathleen M. Sullivan, *Post–Liberal Judging: The Roles of Categorization and Balancing,* 63 U. Colo. L.Rev. 293, 293–94, 296 (1992).

range of cases throughout the prior five decades where the Supreme Court applied the undue burden standard, and the evolving nature of judicial review under that level of scrutiny. *See* Curtis E. Harris, *An Undue Burden Balancing in the Age of Relativism*, 18 Okla. City U.L.Rev. 363 (1993). He calculated that from 1945 to the date of his article, the Supreme Court had used that term or something synonymous in 256 decisions, covering a far-reaching spectrum of constitutional law. *See id.* at 407–09, 423. However, as he discerned, the concept was most frequently deployed in Commerce Clause and abortion cases. *See id.* at 424. Since this article, it has found a home in ballot access cases. Collectively, they serve as guidance to the Court and point to the direction it should travel in the uncharted waters it faces in the present case.[21]

**Abortion Cases:** In the abortion context, an undue burden on a woman's right to choose an abortion is one that presents a "substantial" obstacle to that choice. *See Stenberg v. Carhart*, 530 U.S. 914, 921, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000). In *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), the Court abandoned the trimester framework established in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and adopted the undue burden test to evaluate the regulation of abortions post-viability "in an effort to balance fairly the interests between potential life and a woman's privacy." Elizabeth A. Schneider, *Workabili-*

*ty of the Undue Burden Test,* 66 Temp. L.Rev. 1003, 1003 (1993).

The Court noted that *Roe's* trimester framework had undervalued the state's "important and legitimate interest in protecting the potentiality of human life," *Casey,* 505 U.S. at 871, 112 S.Ct. 2791 (quotations and citation omitted); thus, the undue burden test was meant to accommodate that interest. Accordingly, the Court held that an undue burden exists when a "statute which, while furthering the interest in potential life or some other valid state interest, has the effect [or purpose] of placing a substantial obstacle in the path of a woman's choice" and therefore "cannot be considered a permissible means of serving [the state's] legitimate ends." *Id.* at 877, 112 S.Ct. 2791; *see* Susan Frelich Appleton, *Standards for Constitutional Review of Privacy–Invading Welfare Reforms: Distinguishing the Abortion–Funding Cases and Redeeming the Undue Burden Test,* 49 Vand. L.Rev. 1, 62 (1996) ("The undue-burden test formulated in *Casey* directs courts to consider the purpose and effect of a legal rule or governmental decision.").

**Commerce Clause Cases:** The commerce clause "prohibits state taxation, or regulation, that discriminates against or *unduly burdens* interstate commerce...." *General Motors Corp. v. Tracy,* 519 U.S. 278, 287, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997). The seminal case applying the undue burden test under the commerce clause is *Pike v. Bruce Church, Inc.,* 397

---

**21.** The adoption of the undue burden test by the circuit court in *Velazquez II* for evaluating the adequacy of alternative channels for First Amendment speech in cases where Congress has placed restrictive conditions on subsidies appears to be the first time that it has been articulated in a pure First Amendment speech setting. Nonetheless, the concept of balancing "has had a long affair with the First Amendment." T. Alexander Alenikoff, *Consti-*

*tutional Law in the Age of Balancing,* 96 Yale L.J. 943, 967 (1987). It has invariably been utilized for "time, place, and manner review of content-neutral regulations in public forums" and "content-neutral laws that incidentally sweep in protected speech," requiring the government to show an "important or substantial interest." Sullivan, *supra,* at 297 (internal citation omitted).

U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), where the Supreme Court stated:

> Where [a] statute regulates [commerce] even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Pike,* 397 U.S. at 142, 90 S.Ct. 844 (internal citations omitted).

**Ballot Access Cases:** The origin of the undue burden test in ballot access cases stems from the Supreme Court's articulation in *Lubin v. Panish,* 415 U.S. 709, 716, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974), that "the right to vote is heavily burdened if that vote may be cast only for one of two candidates in a primary election at a time when other candidates are clamoring for a place on the ballot." More recently, Chief Judge Korman, in employing the test in striking down restrictive signature requirements, explained:

> Analysis of the validity of ballot access signature requirements to determine whether they unduly burden the right to vote proceeds in three steps:
>
> [A reviewing court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legit-

imacy and strength of each of those interests, it must also consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all of these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional. *Anderson v. Celebrezze,* 460 U.S. 780, 789[, 103 S.Ct. 1564, 75 L.Ed.2d 547 ] ... (1983) (internal citation omitted).

*Rockefeller v. Powers,* 917 F.Supp. 155, 159–60 (1996), *aff'd,* 78 F.3d 44 (2d Cir. 1996).

What can fairly be gleaned from the articulation of the undue burden standard in the abortion, Commerce Clause and ballot access cases is that there is an obvious qualitative facet to its implementation: the greater the right, the greater the justification needed to compromise the right. The Court should, therefore, examine the nature of the right impacted and the nature and significance of the Government's interests in burdening that right—requiring the Court to determine the legitimacy and strength of each of those interests and "the extent to which those interests make it necessary to burden the plaintiff[s]' rights," *Powers,* 917 F.Supp. at 160—and then weigh one against the other to determine whether the balance has been properly struck by the plaintiff-grantees' Clarified Proposal. *See* Harris, *supra,* at 363 (Judicial balancing "requires the explicit articulation and comparison of rights or structural provisions, modes of infringement, and government interests.").

This is a far-cry from the defendants' restrictive view of the undue burden test— that the program integrity rules should simply "fit" the Government's interest and, in LSC's view, "make it effectively impossible for the grantee to actually exercise its constitutional rights through the alternative channel[.]" June 16, 2004 Tr. at 23.

This is the antithesis of balancing burdens against interests which all courts have embraced whenever called upon to apply an undue burden standard in the face of a constitutional challenge. There is simply no case support for defendants' preclusive position, which would in effect render balancing nugatory, and their reliance on *Rust, TWR and League of Women Voters* is clearly misguided.

Initially, each of those cases only entailed facial challenges, invoking the restrictive constitutional principles applicable to such challenges. Moreover, as has been seen, *Rust* has little bearing here because it involved the use by the government of "private speakers to transmit specific information pertaining to its own programs." *Velazquez III,* 531 U.S. at 541, 121 S.Ct. 1043. *TWR* also offers no cover for defendants. Notably, LSC believes *TWR* supports LSC's "impossibility" criteria because it construes the Supreme Court's language in footnote 6 as holding that the lobbying restrictions would not be unduly burdensome "so long as they did not make it 'effectively impossible' for the tax-exempt entities to establish the affiliates." Letter from Stephen L. Ascher on behalf of LSC (July 15, 2004) at 5. This is an incorrect reading of the footnote. The Supreme Court never rendered such a holding. As previously noted, it was only responding to the concern of "TWR and some *amici* . . . that the IRS may impose stringent requirements" that would make it "effectively impossible for a § 501(c)(3) organization to establish a § 501(c)(4) lobbying affiliate." *TWR,* 461 U.S. at 544 n. 6, 103 S.Ct. 1997. Rather than embrace an "impossibility" standard, the Court, in this footnote, simply noted that it was not unduly burdensome for the IRS to require separate incorporations and record keeping; moreover, as also previously noted, the concurring opinion cautioned that if significant additional constraints were to

be imposed, it would raise "insurmountable" First Amendment problems. *TWR,* 461 U.S. at 553, 103 S.Ct. 1997.

Finally, defendants can hardly draw comfort from *League of Women Voters,* where, in striking down a ban on noncommercial editorializing, the Supreme Court, although rejecting the most exacting degree of First Amendment protection, nonetheless viewed the *nature* of the speech entailed in media broadcasting as "indispensable to the discovery and spread of political truth[,]" 468 U.S. at 383, 104 S.Ct. 3106 (citation omitted), requiring the Court to be "especially careful in weighing the interests that are asserted in support of this restriction and in assessing the precision with which the ban is crafted." *Id.* Rather than support defendants' circumscribed view of the undue burden standard, *League of Women Voters* further counsels the Court to carefully consider the nature of plaintiff-grantees' interests, and cautions the Court to use special care in weighing those interests against the Government's justifications for intruding upon them if they strike at the core of rights protected by the First Amendment.

### 3. The Nature of the Right.

Although (other than the "suits-for-benefits" exception) none of the plaintiff-grantees' rights have been trampled upon in the context of their facial challenges because the Government's restrictions are viewpoint neutral, their entitlement to create alternative channels with non-federal funds for the exercise of their First Amendment rights free from uncalled-for government constraints places these rights in a different posture. Indeed, the circuit court in *Velazquez II* expressly recognized that in an as-applied challenge, "the program integrity requirements may prove especially burdensome in the context of legal services." *Velazquez II,* 164 F.3d at

767. The nature of lawyering is, therefore, very much at issue.

Although the courts have yet to decide "whether the traditional lawyer-client relationship enjoys constitutional protection," *Velazquez II,* 164 F.3d at 765, the Supreme Court in *Velazquez III,* in recognizing that "the LSC program was designed to facilitate private speech," 531 U.S. at 542, 121 S.Ct. 1043, implicitly acknowledged the obvious—that the First Amendment is bound up in the speech and associations inherent in lawyering. Indeed, as the Court noted in *Velazquez I,* "when the Government imposes upon the time-honored functions of the lawyer ... it treads deeply in waters bound up in First Amendment sensibilities." *Velazquez I,* 985 F.Supp. at 342. A good compendium of the breadth of constitutional concerns impacting lawyering, as pointed out in the Court's prior decision, *see id.,* is contained in *LASH I,* encompassing under the First Amendment umbrellas of freedom of speech, freedom of association and the right to petition for the redress of grievances, "meaningful access to the courts"; "protection from government's intentional interference with the confidential relationship between lawyers (or legal aid associations) and prospective clients"; and "the right to lobby legislators and administrators." 961 F.Supp. at 1408–09. And, as *LASH I* points out, although "[n]o appellate court has previously extended First Amendment protection to class actions despite encouragement from scholars[,]" the time may soon come when that will happen. *Id.* at 1410 (citations omitted).

Notably, as for meaningful access to the courts, it is uncertain whether the First Amendment is the exclusive basis for this right. *See Monsky v. Moraghan,* 127 F.3d 243, 246 (2d Cir.1997) ("[T]he source of this right has been variously located in the First Amendment right to petition for re-dress, the Privileges and Immunities Clause of Article IV, section 2, and the Due Process Clauses of the Fifth and Fourteenth Amendments."). Nonetheless, it enjoys a heightened status in the lexicon of constitutional jurisprudence since it encompasses the right to petition for the redress of grievances, which is "among the most precious of liberties safeguarded by the Bill of Rights[,]" *United Mine Workers of Am. v. Illinois Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967); moreover "its historical reach is such that it has poignantly been argued that it is even more firmly rooted than the freedoms of speech and press." *Brown v. Stone,* 66 F.Supp.2d 412, 433 (E.D.N.Y. 1999) (citing Kara E. Shea, Note, San Filippo v. Bongiovanni: *The Public Concern Criteria and Scope of the Modern Petition Right,* 48 Vand. L.Rev. 1697, 1700 (1995) ("There is no doubt that the recognition of the petition right in Anglo–American jurisprudence substantially predates the recognition of the other enumerated first amendment rights.")). *See also Roberts v. United States Jaycees,* 468 U.S. 609, 637, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) (O'Connor, J., concurring) ("[S]ome lawyering activity is undoubtedly protected by the First Amendment. '[C]ollective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment.'" (quoting *In re Primus,* 436 U.S. at 426, 98 S.Ct. 1893)).

With this heightened view of the nature of speech and the other constitutional precepts at the heart of lawyering, the Court now turns to the application of the undue burden standard in the present case.

### 4. The Burdens

Plaintiff-grantees argue, collectively, that precluding affiliates from sharing equipment, personnel and physical space

(meaning same physical location but separate rooms or same rooms but at separate times) unduly imposes (1) financial, (2) programmatic, and (3) administrative burdens.

In regard to the financial burdens, they point out the obvious—that to require the duplication of programs, office space, equipment, personnel, and administrative structures, would be substantial. As for the programmatic burdens, they contend that LSC's restrictions would result in dramatically less effective provision of legal services, citing, as an example, that "lawyers in LSC-restricted programs that receive some LSC funding are less able to effectively represent their clients if they are segregated from the lawyers who are handling class wide claims" because "[t]he capacity to spot issues in need of litigation, to learn about class wide claims and class wide relief, and to integrate clients claims into larger suits or lobbying efforts confronting systemic problems, is effectively impaired when advocates are impeded in their efforts to associate with lawyers bringing class actions or lobbying." Pls.' Notice Mo. Consol. & Prelim. Inj. ("Pls.' Notice"), Ex. J, Declaration of Andrew Scherer ¶ 17.

The administrative burdens, in plaintiff-grantees' view, flow from the need to "allocat[e] personnel and resources between the separate programs"; "decid[e] which cases are to be allocated to which program"; and "regulat[e] contact between and among the lawyers employed by the separate programs." Pls.' Mem. at 29. Thus, operating an affiliate in a separate physical location and with separate staff would hamper "effective communication and coordination among the staff" because "casehandlers in the two programs would have to figure out how to discuss different matters being handled for the same client. Project directors would have to answer constant practical questions about allocation of staff [and][s]eparate boards would have to make decisions concerning . . . resources and fundraising efforts." Pls.' Notice, Ex. E, Declaration of John C. Gray ¶ 12.

LSC declined an offer by the Court for a hearing to factually challenge plaintiff-grantees' propounded administrative and programmatic burdens, see Order dated Nov. 8, 2004 at 6 (inquiring "whether a factual hearing need be held . . . regarding these alleged burdens"), adhering to its previously declared position that they were "based purely on speculation" because "none of the program plaintiffs has actually created an affiliate." Letter from Stephen L. Asher on behalf of LSC (July 15, 2004) at 7 n. 4. See Nov. 15, 2004 Tr. at 19 ("LSC's position is that since none of the grantee plaintiffs have actually tried to do this, that the burdens they are referencing here are purely speculative, and we really don't have a concrete sense of how burdensome they can be."). In light of its rejection of the Clarified Proposal, LSC's argument is obviously circular.

On an individual basis, plaintiff-grantees have established, pursuant to the parties' stipulation, the following relevant undisputed facts, which give specific content to these general burdens:

a. LSNY

LSNY is an umbrella LSC entity servicing indigent civil clients throughout New York City, and allocates its annual federal grants to various associated legal services units, such as Queens Legal Services ("QLSC") and plaintiff-grantee SBLS. Representative of its dependency on LSC and non-LSC funds, out of its total budget in 2001 of approximately $32,000,000, the sum of $12,000,000 (38%) came from LSC. See Stipulation ¶¶ 19, 20. In 2001, QLSC estimated that it would cost at least

$200,000 per year if it were to create an affiliate to operate in a separate location and not share equipment or staff. *See id.* ¶ 25. Neither QLSC nor any other LSNY unit has created an affiliate to provide unrestricted legal services with non-LSC funds. *See id.* ¶ 29.

### b. SBLS

SBLS services indigent civil clients in Brooklyn and, as noted, receives LSC funds from LSNY. It had a budget in 2000 of $4,301,372, of which 33% came from LSC, and the remaining 67% from private and non-LSC government donors. *See id.* ¶ 36. As of June 2004, it had 34 lawyers, and currently has one intake mechanism and one board of directors. *See id.* ¶¶ 37–39. "At some point in time prior to June 2002," it determined that "an affiliate which operated in a physically separate locality, did not share any equipment and shared only one attorney, would cost the organization at least $380,000, which is 8% of the budget." *Id.* ¶ 41. Specifically, these expenses "would cover additional staff, equipment and rent," resulting in the unrestricted affiliate serving approximately 500 fewer clients than SBLS then served; moreover, "SBLS and the unrestricted affiliate would have fewer staff available to serve clients than SBLS now has." *Id.* Accordingly, SBLS has not created an affiliate. *See id.* ¶ 42.

### c. FWLS

FWLS serves clients throughout New York State's rural areas, representing migrant and seasonal farm workers and many non-citizen clients. *See id.* ¶¶ 53, 55. Its work involves reaching out to workers in isolated rural labor camps; accordingly, its attorneys frequently travel long distances since its clients often do not have access to telephones or to public transportation. *See id.* ¶¶ 57–60. In 1996, at the

time the restrictions were imposed, its annual budget, with federal funding, was $582,000. *See id.* ¶ 73. It thereafter declined further federal funding of $106,000 for the second half of 1996, rather than be subject to the restrictions; this resulted in the reduction of two attorney positions and all four of its support staff positions. *See id.* ¶¶ 72, 74. It currently operates one office with eight employees. *See id.* ¶ 75. If it were to once again receive federal funding, it would open two additional offices in order to better serve its statewide clientele. *See id.*

After the restrictions were enacted, FWLS considered whether it could feasibly create an affiliate, but calculated that "if it created a dual office structure, with separate executive directors, separate staff, separate furniture, separate equipment, separate computers, and other separate administrative requirements, it would cost the organization at least $130,000 in the first year and $80,000 annually thereafter." *Id.* ¶ 63. In 1997, it considered creating an affiliate "to operate exclusively with non-LSC funds, and to share all staff, all equipment and all physical premises with FWLS"; it would keep separate financial records, time records, and activity reports to ensure that LSC funds would not be spent on restricted activities. *Id.* ¶ 66. Its executive director was informally told by LSC that this would probably not satisfy the program integrity rules; consequently, it never submitted an affiliation proposal and chose to continue to function without LSC funding. *See id.*

LSC and the Government take a dim view of these financial burdens, contending that they are not imposed by the Government but are simply representative of the inherent costs in the establishment of any affiliate, and should not suffice to countermand the overarching rationale behind the program integrity rules of ensuring that

LSC funds are devoted to providing basic civil legal services to indigents, rather than the more expansive services reflected by the restricted activities.

### 5. The Government's Asserted Interests

LSC has articulated two governmental interests that it contends are served by the program integrity rules' requirement of physical and financial separation: "prevent[ing] federal funds from indirectly subsidizing activities that Congress did not want to subsidize directly, and also … prevent[ing] the appearance that the federal government was funding the restricted activities." LSC's Mem. Opp. Pls.' Mot. Prelim. Inj. ("LSC's Mem.") at 4 (emphasis omitted). These interests reflect Congress' rationale for restricting the use of non-federal funds by recipients of LSC grants:

> There are two important justifications for this restriction. First, many legal services grantees currently receive funds from both public and private sources[.] Since the money is basically fungible, it would be difficult if not impossible to place restrictions only on the Federal funds. Second, the public cannot differentiate between LSC advocacy subsidized with public versus private funds. As a result, the public grows weary of watching LSC attorneys lobby legislators—even if that dismay might sometimes be misplaced.

S.Rep. No. 104–392 (1996) at *7. See also H.R.Rep. No. 104–196 at *121 ("The Committee recommendation significantly strengthens current restrictions and expands them to encompass all funding received by a grantee…. The Committee believes that it is inappropriate for Federal resources to be used to support directly or indirectly these [prohibited] activities."). The Court considers each of these justifications, in turn.

### a. Preventing the Appearance of Endorsement of Restricted Activities

Initially, defendants rely on *Rust* and *National Endowment of the Arts v. Finley,* 524 U.S. 569, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998), to support the significance of the Government's interest in preventing the appearance that it is endorsing prohibited activities. Such reliance is misplaced. As previously noted, *Velazquez III* teaches that the LSC program is distinguishable from the Title X program at issue in *Rust* in "the vital respect" that "the LSC program was designed to facilitate private speech," whereas the Title X program used private speakers "to promote a governmental message." 531 U.S. at 541–42, 121 S.Ct. 1043 (explaining that LSC-funded attorney speaks not on the behalf of the government but "on the behalf of his or her private, indigent client."). Because under the LSC program "there is no programmatic message of the kind recognized in *Rust* [,]" *id.* at 548, 121 S.Ct. 1043, the Government's interest in preventing the appearance of endorsement is much less weighty here than it was in *Rust*.

*Finley* is also inapposite. In addressing the question of whether the Government could make aesthetic judgments about decency in awarding funding for the arts, the Supreme Court made passing reference to Congress' authority to selectively fund one activity to the exclusion of another, *see Finley,* 524 U.S. at 588, 118 S.Ct. 2168; however, the Government's interest in preventing the appearance of endorsement was not at issue in that case.

The Government's interest in preventing the appearance of endorsement has been addressed primarily in the context of the First Amendment's Establishment Clause. *See, e.g., Capitol Square Review & Advisory Bd. v. Pinette,* 515 U.S. 753,

115 S.Ct. 2440, 132 L.Ed.2d 650 (1995). The Supreme Court has explained that the Government's desire to comply with the Establishment Clause is a sufficiently compelling interest, in some circumstances, to justify content-based restrictions on speech. *See id.* at 761–62, 115 S.Ct. 2440. Nonetheless, despite the compelling nature of this interest, the Supreme Court has noted that disclaimers may suffice. For example, in *Pinette* the Supreme Court considered whether Ohio violated the First Amendment by prohibiting the display of a cross on state capitol grounds. The state relied on its "interest in avoiding official endorsement of Christianity, as required by the Establishment Clause[,]" to justify the prohibition. *Id.* at 761, 115 S.Ct. 2440. A plurality of the Court explained that "[i]t has radical implications for our public policy to suggest that neutral laws are invalid whenever hypothetical observers may—even reasonably—confuse an incidental benefit to religion with state endorsement. If Ohio is concerned about misperceptions, nothing prevents it from requiring all private displays in the Square to be identified as such." *Pinette,* 515 U.S. at 768–69, 115 S.Ct. 2440. *See also Board of Educ. v. Mergens,* 496 U.S. 226, 270, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (Marshall, J., concurring) (explaining that school district could avoid appearing to sponsor or endorse a Christian club's goals by "affirmatively disclaim[ing] any endorsement" of the club); *Hsu v. Roslyn Union Free Sch. Dist. No. 3,* 85 F.3d 839, 864–65 (2d Cir. 1996) (explaining that when the Roslyn

school board recognized a Christian club, it "drew a *cordon sanitaire* between the School and the Club" by directing the superintendent "to cause all listings, communications and announcements issued by the District pertaining to said Club expressly to state that the Roslyn School District does not endorse the Club, but is mandated by the Federal Equal Access Act to permit the Club's activities. These terms meet the requirement of Justice Marshall's concurrence in *Mergens* "; accordingly, "the School's stated purpose could not be mistaken for an endorsement." (internal quotations omitted)).

In a related context, for federal "charitable choice" programs, which fund religious organizations to perform secular social services activities, Congress has required only minimal bookkeeping separation to satisfy its concern with preventing the appearance of endorsement of religion. *See, e.g.,* Personal Responsibility and Work Opportunities Reform Act of 1996, Pub.L. 104–193, 42 U.S.C. § 604a(j); Human Services Reauthorization Act of 1998, Pub.L. 105–285, 42 U.S.C. § 9920(c),(d); Children's Health Act of 2000, Pub.L. 106–310, 42 U.S.C. § 300x–65.

 From the foregoing, the Court gleans that even in the context of the Establishment Clause, where government entities have a significant interest in avoiding the appearance that they have violated the Constitution by endorsing religion, disclaimers and bookkeeping have been deemed sufficient to satisfy that interest.[22]

---

**22.** Disclaimers have also been held sufficient to prevent public confusion over private endorsement of speech. Notably, in *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980), the Supreme Court held that a California law permitting individuals to exercise their free speech rights at privately owned shopping centers did not violate the shopping center

owner's First Amendment rights. The owner argued that he had a right "not to be forced by the State to use his property as a forum for the speech of others." *Id.* at 85, 100 S.Ct. 2035. Rejecting this argument, the Supreme Court noted that "appellants can expressly disavow any connection with the message by simply posting signs in the area where the speakers or handbillers stand. Such signs,

In the context of legal services programs, however, there is no similar constitutional mandate prohibiting endorsement. Instead, Congress' interest in preventing the appearance of endorsement was simply grounded in its perception that the public was "grow[ing] weary of watching" LSC-funded attorneys engage in restricted activities. S.Rep. No. 104–392 at *7.

The Court cannot conclude, however, as plaintiff-grantees urge, that the Government has *no* legitimate interest in preventing clients, litigants, the courts and the public at large from becoming confused about whether Congress is funding restricted activities. Such an interest goes hand-in-hand with Congress' broad power to define the limits of programs supported by public funds. *See, e.g., League of Women Voters,* 468 U.S. at 395, 104 S.Ct. 3106 ("[T]he Government certainly has a substantial interest in ensuring that the audiences of noncommercial stations will not be led to think that the broadcaster's editorials reflect the official view of the government...."). Nonetheless, the Government has not explained why its interest in preventing the public appearance of endorsement is so weighty, given that the LSC program was designed to facilitate private speech, that it cannot be accommodated by employing simple prophylactic measures. *See id.* (explaining that the Government's interest in preventing public confusion "can be fully satisfied by ... simply requir[ing] public broadcasting stations to broadcast a disclaimer every time they editorialize which would state that the editorial represents only the view of the station's management and does not in any way represent the views of the Federal Government or any of the station's other sources of funding.").

**b. Preventing Indirect Subsidization of Restricted Activities**

LSC contends that this asserted interest has two components: (1) ensuring that as a result of LSC's support, non-federal funds are not "freed up" to support restricted activities; (2) discouraging affiliates from taking advantage of economies of scale by sharing facilities with grantees. *See* June 16, 2004 Tr. at 13 ("LSC funds would free up the non-LSC funds for the grantee to do more [restricted activities]"); Letter from Stephen L. Ascher on behalf of LSC (Jul. 15, 2004) at 7 ("Because money is fungible, there is a danger that a subsidy could have the effect of promoting ... restricted activities by making more funds available to the grantee as a whole and allowing the grantee to take advantage of certain economies of scale."). Plaintiff-grantees respond that "[t]he government has no valid interest in erecting an economic spite fence that is designed to discourage disfavored First Amendment activity by raising its cost...." Pls.' Reply Mem. at 30.

With respect to the first component, the Court rejects the notion that simply because the Government would prefer that plaintiff-grantees use their non-federal funds for activities favored by the Government, the Government has a legitimate interest in discouraging them from using non-federal funds to engage in constitutionally protected First Amendment activities by placing significant burdens on their ability to establish affiliates to engage in such activities. *See Cullen v. Fliegner,* 18 F.3d 96, 104 (2d Cir.1994) ("a state cannot have a legitimate interest in discouraging the exercise of constitutional rights").

for example, could disclaim any sponsorship of the message and could explain that the persons are communicating their own messages by virtue of state law." *Id.* at 87, 100 S.Ct. 2035.

With respect to the second component, which relates to the separate facilities factor of the program integrity rules, the Court again finds *League of Women Voters* instructive. In rejecting the FCC's argument that a ban on editorializing by noncommercial educational broadcasting stations that accepted federal funds was necessary to prevent the subsidization of editorializing, the Supreme Court explained that the ban would be constitutional if it "permitted noncommercial educational broadcasting stations to establish 'affiliate' organizations which could then *use the station's facilities* to editorialize with nonfederal funds...." 468 U.S. at 400, 104 S.Ct. 3106 (emphasis added). The Court recognizes that the cost and difficulty for a broadcasting station to set up separate broadcasting facilities for editorializing is likely greater than for a legal services organization to establish separate facilities for an affiliate; nonetheless, it is worth noting that the Supreme Court in *League of Women Voters* did not share the Government's concern that the risk of subsidization necessarily required separate facilities.

Moreover, the Government has a countervailing interest in ensuring that indigent legal-services clients receive efficient and effective representation. *See* 42 U.S.C. § 2996f(a)(3) (requiring LSC to "insure that grants and contracts are made so as to provide the most economical and effective delivery of legal assistance...."); 45 C.F.R. § 1634.9(a)(2) (enumerating LSC's selection criteria for grant applicants, including the "feasibility and cost-effectiveness of the applicant's legal services delivery and delivery approach"). By requiring grantees to establish separate facilities for their affiliates in order to engage in protected First Amendment activities, the program integrity rules negatively impact the grantees' efficiency and effectiveness.

For all these reasons, the Court concludes that the Government's interest in preventing the indirect subsidization of restricted activities is not so weighty as to support the imposition of significant restrictions on the sharing by a plaintiff-grantee of its facilities with an affiliate. Nonetheless, it cannot be said that LSC has no legitimate interest in ensuring that federal funds will not be used to support restricted activities. LSC has not explained, however, why this interest cannot be accommodated by simple timekeeping and accounting methods. *See* S.Rep. No. 104–392 (Additional Views of Senators Kennedy, Pell, Dodd, Simon, Harkin, Mikulski and Wellstone) at *21 ("Any concern about fungibility of funds can be addressed by strict timekeeping requirements. In fact, the new timekeeping requirements will ensure that LSC funds are not used inappropriately to supplement or provide overhead for restricted activities that Congress has determined are inconsistent with the purposes of the LSC Act.").[23]

## 6. The Balancing

Although an agency's reasonable interpretation and application of its rules are ordinarily entitled to deference, no deference attaches where, as in the present case, "they raise serious constitutional questions." *Miller v. Johnson,* 515 U.S. 900, 923, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995); *see also* Administrative Procedure Act, 5 U.S.C. § 706(2) (requiring a court to

**23.** Section 504(a)(10) of the Act requires the recipient to "maintain records of time spent on each case or matter with respect to which the person or entity is engaged," and to ensure that funds "received from a source other than [LSC] ... and disbursements of such funds, are accounted for and reported as receipts and disbursements, respectively, separate and distinct from [LSC] funds[.]"

"hold unlawful and set aside agency action, finding and conclusions found to be (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law" or "(B) contrary to constitutional right, power, privilege, or immunity"); *Esden v. Bank of Boston*, 229 F.3d 154, 168 (2d Cir.2000) ("an agency's reasonable, consistently held interpretation of its own regulation is entitled to deference" provided it "does not violate the Constitution").

Indeed, the very purpose for the adoption of the program integrity rules was to provide a vehicle for the unrestricted use of non-federal funding of legal services for the poor in order the save the Act's constitutionality. The history of the evolution of the final program integrity rules, as recounted by the Court in *Velazquez I*, reflects that they escaped constitutional interdiction because, unlike the interim rules, they provided that "LSC-funded legal aid societies will be able to control affiliates who care for the poor in areas from which the regulations restrict the societies," *Velazquez I*, 985 F.Supp. at 336 (quoting *Legal Aid Society of Hawaii v. Legal Services Corp.*, 981 F.Supp. 1288 (D.Haw.1997) ("*LASH II*")), and eliminated the *per se* requirement for insular separate facilities. *See id.* at 335. *See also LASH II*, 981 F.Supp. at 1289 ("With this ability to control the separately incorporated and insular second organization, the Court finds that alternative channels exist for LSC-funded organizations to exercise their constitutionally protected rights such as lobbying the legislature."). While the unconstitutional-conditions doctrine "does not require regulations to eliminate all practical difficulties in pursuing the alternative channel in order to pass constitutional muster," *id.* at 1295, this history elucidates the care that has been taken by the courts to ensure that the rules adopted by LSC will give birth to viable alternative channels, and not place unjustifiable obstacles in the path of their creation.

LSC's application of the various factors comprising physical and financial separation so that a recipient will have "objective integrity and independence from any organization that engages in restricted activities," 45 C.F.R. § 1610.8(a), must therefore be viewed with this constitutional history in mind, and with a careful eye as to whether LSC hewed to its two legitimate justifications in rejecting the plaintiff-grantees' Clarified Proposal—preventing the appearance of endorsement and the indirect subsidization of restricted activities.

 Given the nature and constitutional dimension of plaintiff-grantees' right to establish affiliates with non-federal funds in order to provide the full range of First ·Amendment activities inherent in the rendering of legal services, and the nature of LSC's justifications, such as they are, for the promulgation and application of its program integrity rules, plaintiff-grantees' detailed Clarified Proposal strikes the proper balance to ensure that LSC's legitimate interests will be accommodated without unduly burdening this right, except in respect to certain aspects of the four parts of the Clarified Proposal which have divided the parties in regard to the sharing of equipment, physical premises, employee time and intake. Their differences, however, are not profound. Indeed, LSC has acknowledged that the Clarified Proposal's "signage and disclaimers would appear to indicate physical and financial separation," and has recognized that a grantee and its affiliate could "share all physical premises, equipment and staff" if they had "extensive signage and other indicia of separateness to address the obvious perception that the respective organizations are not, in any but a superficial way, physically and financially separate." *See* OLA External

Opinion at 6. The following qualifications in respect to these four aspects of the Clarified Proposal will, in the Court's view, accommodate the requisite balancing of the parties' competing interests.[24]

### a. Equipment

LSC has not articulated how the sharing of equipment would implicate its interest in avoiding the appearance of endorsement. As for indirect subsidization, it can fully be addressed through accounting mechanisms. There is simply no legitimate justification for requiring duplication of costs.

### b. Physical Premises

The Court agrees with LSC that some degree of separate physical premises is justified to avoid the appearance of endorsement. In areas open to the public (for example, reception areas and conference rooms to meet with clients or to conduct depositions or interview witnesses), separate rooms are appropriate to serve this interest with, of course, appropriate signage. However, LSC's interest in avoiding the appearance of endorsement does not justify separate physical premises for areas not seen by the public. The Court believes, however, that permitting client contact with LSC and non-LSC clients in the same room, albeit at different times, is bound to create public confusion, and should not be countenanced.

With respect to avoiding indirect subsidization, the sharing of costs when common non-public physical facilities are utilized, can readily be accommodated by simple timekeeping and accounting methods.

### c. Employee Time

Similar to separate physical premises, the issue of employee time relates to both of LSC's asserted interests. However, these interests provide no sound reason to preclude sharing lawyers, provided they keep accurate records of the time served and monies spent on each file so that their salaries and costs can be properly apportioned, and they make the nature of their retention clear to their clients, adversaries and the courts. However, lawyers handling a case containing both restricted and non-restricted components must identify themselves as lawyers for the affiliate and charge all their time and costs to the affiliate for the duration of the case. Similarly, there is no reason to require separate executive directors or other office personnel, provided their salaries and expenditures are also properly allocated, and they identify the entity they represent when dealing with the public.

### d. Intake

The intake issue principally implicates the appearance of endorsement. LSC does not take issue with plaintiff-grantees' proposal for a common intake mechanism. Indeed, it makes perfect sense that a prospective client should be directed to the proper office. The Court, however, agrees with LSC that "[a]s the point of entry for clients, a shared intake mechanism must clearly differentiate between the two entities" so that clients will "clear[ly] experience ... being directed to one of two separate organizations rather than merely being routed within one entity." OLA External Opinion at 8. As for indirect subsidi-

---

**24.** The Court has a "wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct," *Forschner Group, Inc. v. Arrow Trading Co.*, 124 F.3d 402, 406 (2d Cir.1997) (citations and quotations omitted), and a responsibility "to mould each decree to the necessities of the particular case." *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 646 F.2d 800, 806 (2d Cir.1981) (citations and quotations omitted).

zation, the costs of the common intake mechanism should, once again, be proportionally shared, which also can readily be accommodated by simple timekeeping and accounting methods.

## CONCLUSION

Plaintiffs' facial preliminary injunction applications regarding the Tenth Amendment and the class-action, attorney's-fees and solicitation claims are denied. Because the government-donor plaintiffs have no standing to assert their Tenth Amendment challenge, defendants' 12(b)(1) motion to dismiss is granted as to those plaintiffs. In respect to the remaining plaintiffs, defendants' 12(b)(1) motion is denied, but defendants' 12(b)(6) motion to dismiss their Tenth Amendment, class-action, attorney's-fees and solicitation claims is granted, since they are not legally cognizable.[25]

In respect to plaintiff-grantees' preliminary injunction applications regarding their as-applied challenges, LSC shall be enjoined from withholding federal funds from plaintiff-grantees and from precluding plaintiff-grantees from forming affiliates with their non-federal funds, provided plaintiff-grantees comply with the terms and conditions of their Clarified Proposal, as qualified by the Court; accordingly, defendants' 12(b)(1) and 12(b)(6) motions are denied in respect to those claims. Plaintiff-grantees have satisfied the "probability of success" standard "when a plaintiff seeks to enjoin governmental action taken in the public interest pursuant to a statutory or regulatory scheme," *Velazquez I*, 985 F.Supp. at 337 (citations

omitted), and they are deemed to have suffered irreparable harm because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).[26]

**SO ORDERED.**

---

25. Even if the government-donor plaintiffs' Tenth Amendment claim were not dismissed for lack of standing, it would accordingly be dismissed for failure to state a claim.

26. In light of the Court's decision, and the extended history of this litigation, the parties shall notify the Court within 30 days from the date of filing whether there are any viable claims that remain and, if not, whether there is any reason why finality should not now be achieved by converting the preliminary injunction into a permanent injunction.